# CORNELL UNIVERSITY v. FISKE.

ERROR TO THE SUPREME COURT OF THE STATE OF NEW YORK.

No. 1224.   Argued April 8, 9, 1890. — Decided May 19, 1890.

Under the will of a testatrix who resided in New York, Cornell University, a corporation of that State, was made her residuary legatee. It was provided in its charter that it might hold real and personal property to an amount not exceeding $3,000,000 in the aggregate.   The Court of Appeals of New York having held that it had no power to take or hold any more real and personal property than $3,000,000 in the aggregate, at the time of the death of the testatrix, and that, under the jurisprudence of New York, her heirs at law and next of kin had a right to avail themselves of that fact, if it existed, in the controversy about the disposition of the residuary estate, this court held that such decision of the Court of Appeals did not involve any federal question and was binding upon this court.

This court concurred with the Court of Appeals, 111 N. Y. 66, in holding that, at the time of the death of the testatrix, the property held by Cornell University exceeded $3,000,000, and, therefore, it could not take her legacy.

A federal question was involved in this case, arising under the act of Congress of July 2, 1862, 12 Stat. 503, c. 130, granting lands to the State of New York to provide a college for the benefit of agriculture and the mechanic arts.

The legislation of New York on the subject, in its acts of May 5, 1863, May 14, 1863, April 27, 1865, April 10, 1866, May 4, 1868, and May 18, 1880, and the contract of the State with Ezra Cornell, of August 4, 1866, selling to him the land scrip received by the State from the United States under the act of Congress, did not violate that act.

MR. JUSTICE BLATCHFORD stated the case as follows:

This is a proceeding which originated in the surrogate's court of the county of Tompkins, in the State of New York. John McGraw, a resident of Ithaca, in that county, died May 4, 1877, leaving as his only child and heir Jennie McGraw, who, on the 14th of July, 1880, at Berlin, Germany, intermarried with Willard Fiske, and died September 30, 1881, at Ithaca, her place of residence, after reaching the age of 41, without issue, leaving her husband surviving her.   John

McGraw left a last will and testament, which was duly admitted to probate by the surrogate of Tompkins County, and of which his daughter, Jennie McGraw, and Douglass Boardman, and the survivor of them were made sole executors. His daughter, Jennie McGraw Fiske, also left a last will and testament, by which she made Douglass Boardman her sole executor, and which was duly proved and admitted to probate by the surrogate. Excepting about from $130,000 to $150,000 in value, which came to her by devise and bequest from her grandfather, John Southworth, the title to the estate and property which formed the subject of disposition by her will came through the will of her father, John McGraw.

On the 8th of January, 1883, after due citation of all parties interested, there was a judicial settlement of the accounts of Douglass Boardman, as executor of Mrs. Fiske's estate, and a decree entered by the surrogate confirming all payments theretofore made by the executor, and directing the balance of said estate to be paid to Cornell University, as her residuary legatee, and also a decree settling the accounts of said Boardman as surviving executor of John McGraw, and transferring the balance of his estate to the estate of Mrs. Fiske.

On the 6th of September, 1883, on the petition of Willard Fiske, as her surviving husband, the decree settling her estate was opened by the surrogate, and he was permitted to be heard with like effect as if he had appeared on the 8th of January, 1883, such opening being without prejudice to payments made or acts done by the executor in pursuance of her will and of said decree, but leaving the validity and effect of those acts and the rights of the respective parties therein for future adjudication ; and on the 24th of October, 1883, a similar order was made opening the said decree of settlement in both estates, on the application of certain persons as the heirs and next of kin to Mrs. Fiske, and also on the application of certain legatees and devisees under John McGraw's will. Proofs were taken, the case was heard by the surrogate in November, 1885, and on the 25th of May, 1886, he made and filed his findings and entered his decision and decree, affirm-

ing in all things his original decrees as to the two estates. On the 23d of June, 1886, the several contestants made and served their exceptions to his findings, and duly appealed to the Supreme Court from his decision and decree. They also requested him to make certain findings upon questions of fact, and rulings upon questions of law, some of which requests he granted and some of which he refused, and exceptions were taken to his refusals.

The controversy in the case, so far as it presents itself for our consideration, is between Cornell University on the one side and the husband, heirs at law and next of kin of Mrs. Fiske on the other side. It was provided by section 5 of the charter of Cornell University that it might "hold real and personal property to an amount not exceeding three millions of dollars in the aggregate;" and the material question in dispute is as to whether, at the time of the death of Mrs. Fiske, on the 30th of September, 1881, the university held real and personal property to the amount of three millions of dollars in the aggregate.

Of the findings of fact made by the surrogate the following are the only ones which seem material to the case as it is before us:

"62. The Cornell University has had at all times since its incorporation, and now has legal and corporate capacity to take by gift, grant or devise real property in the States of Michigan, Wisconsin, Iowa, Minnesota, Ohio, Indiana, Kansas and New Jersey, and such is the law in those States respectively concerning foreign corporations like the university.

"63. The Cornell University has legal capacity to take, and did take by devise, all the real property the title to which was in Jennie McGraw Fiske at the time of her death, under her last will and testament, situate in the States of Michigan, Wisconsin, Iowa, Ohio, Indiana and New Jersey."

"66. The absolute title to the whole of the land situated in New Jersey passed under the will of Mrs. Fiske to Cornell University."

"75. At the date of Mrs. Fiske's death, September 30, 1881, Cornell University had, held and owned real and personal

property which it derived from the founder and other friends of the university, or which was purchased with funds furnished by them or with the income of such funds, and which property, September 30, 1881, was of the value of five hundred and ninety-eight thousand five hundred and eighty-eight and $\frac{65}{100}$ dollars ($598,588.65) in the aggregate." Then follows a description, by items, of the property thus held and owned by the university, with the separate value of each item, as of September 30, 1881. The last item is as follows: "The farm and grounds on which the university buildings are located, consisting of about 260 acres, including the buildings and reservoir, $69,683.33."

"93. The following is a recapitulation of the findings of fact relating to the property of Cornell University, viz.:

"September 30, 1881, Cornell University had, held and owned the property derived from individuals and described in the foregoing 75th finding of fact, to the amount and value of not exceeding $598,588.65 in the aggregate. At the same time Cornell University had, held and owned the property derived from the nation and State, and described in the foregoing findings, to the amount and value of not exceeding $2,088,012.78 in the aggregate, as follows: Western land contracts, $439,834.22; Western lands, $1,648,178.56; total, $2,088,012.78.

"But under and in pursuance of the Cornell contract of August 4, 1866, the whole net proceeds of the avails of said last-mentioned property, being the proceeds of the sale of said college land scrip or lands located therewith, was at that time due or payable by Cornell University to the State of New York, and the total amount and value of the property had, held and owned by Cornell University, September 30, 1881, over and above its obligations to the State of New York, as defined by said contract, was $598,588.65.

" At that time Cornell University had, held and owned the right to 'the income, revenue and avails which should be received from the investment of the proceeds of the sale of the lands or the scrip therefor, or any part thereof, granted to the State of New York by the act of Congress entitled " An act

donating public lands to the several States and Territories which may provide colleges for the benefit of agriculture and the mechanic arts," approved July 2, 1862,' which right to said 'income, revenue and avails' was granted, and for a valuable consideration, paid by Ezra Cornell, was contracted, to Cornell University by section 6 of its charter. The right to the income, etc., of the proceeds of said sales, September 30, 1881, extended to the College Land Scrip Fund and Cornell Endowment Fund, as they then existed, and to all the proceeds of said sales which would or might come to said funds by virtue of the sale to Ezra Cornell of said college land scrip under his contract of August 4, 1866.

" At that time also Cornell University had possession of the Cornell Endowment Fund, and the State of New York had possession of the College Land Scrip Fund.

" Tabular Statement.

" Funds derived from individuals, described in

| | |
|---|---|
| 75th finding of fact . . . . . . . . . | $598,588 65 |
| " Funds derived from nation and State: | |
| " Western Lands . . . . . . . . . . . . | 1,648,178 56 |
| " Western land contracts . . . . . . . . | 439,834 22 |
| " Cornell Endowment Fund . . . . . . . | 128,596 61 |
| " College Land Scrip Fund . . . . . . . | 473,402 87 |
| | $3,288,600 91 |

" Making the total funds which belonged to Cornell University, September 30, 1881, under section 5 of its charter, $598,-588.65, and the total funds already realized and to be realized, only the right to the income of which at that date belonged to Cornell University, under section 6, was $2,690,012.26.

" 94. I find that the sum of all the property, real and personal, which the said Cornell University had taken before September 30th, 1881, by gift, grant, devise or bequest, did not exceed one million and six hundred thousand dollars.

" 95. It has not been proved nor established that the property of the Cornell University, owned and held by it on the

30th day of September, 1881, the date of the death of Jennie McGraw Fiske, together with that devised and bequeathed by her last will and testament to said university, exceeded the sum of three millions of dollars."

On his findings of fact the surrogate decided and held as follows, as conclusions of law:

" I decide and hold, as conclusions of law, that Douglass Boardman, as executor of the last will and testament of Jennie McGraw Fiske, deceased, and as sole surviving executor of John McGraw, deceased, and Cornell University, are entitled to a decree directing:

"(*a.*) That the accounts of Douglass Boardman, as executor of Jennie McGraw Fiske, deceased, and as sole surviving executor of John McGraw, deceased, filed in the Tompkins County surrogate's office on the 8th day of January, 1883, be in all respects allowed, and the decrees, including the summary statements therein contained, recorded and entered upon said accounts, be in all respects ratified and affirmed, including all payments heretofore made by said executor to Cornell University.

" (*b.*) That the said executor pay over to Cornell University the sum of one hundred forty-one thousand six hundred and seventy-six and $\frac{72}{100}$ dollars ($141,676.72), being the balance on hand January 1, 1885, and ready for distribution.

"(*c.*) And adjudging that said Cornell University is the owner and entitled to all the rest, residue and remainder of said estate, and directing said executor to pay the same, when sold, to said Cornell University, in money, or in such other form, or at such other time, as may be mutually agreed upon between said Cornell University and said executor."

The decree of the surrogate being in accordance with his findings and conclusions of law, the husband and the heirs at law and next of kin of Mrs. Fiske appealed to the Supreme Court of the State of New York, from the whole of the decree, the appeal being taken both upon facts and upon questions of law. The case was heard by the general term of that court, and is reported in 45 Hun, 354. Judge Hardin, the presiding judge, delivered an opinion, in which Judge Follett concurred;

and Judge Merwin also delivered a concurring opinion. The three judges were unanimous in reversing the decree of the surrogate.

In the judgment entered by the general term of the Supreme Court, on the 14th of December, 1887, the surrogate's finding of fact numbered 62 was modified so as to read as follows: "62. The Cornell University has had at all times since its incorporation, and now has, legal and corporate capacity to take, by gift, grant or devise, real property in the States of Michigan, Wisconsin, Iowa, Minnesota, Ohio, Indiana, Kansas and New Jersey, subject to the limitation in its charter; and such is the law in those States respectively concerning foreign corporations like the university." His finding of fact numbered 63 was reversed and stricken out. His finding, above recited, in No. 66, as to the title to the land situate in New Jersey, was reversed and stricken out. All those parts of his finding numbered 75, which fixed the value of the item mentioned last therein at $69,683.33, and which fixed the total value of the items named in that finding at $598,588.65, and each clause in any of his findings which recapitulated those values respectively at the sums so stated, especially so much of finding numbered 93 as stated that, on the 30th of September, 1881, "Cornell University had, held and owned the property derived from individuals and described in the foregoing 75th finding of fact, to the amount and value of not exceeding $598,588.65 in the aggregate," were reversed and stricken out, but only in so far as the aggregate of $598,588.65 was made up of the last item in the 75th finding, namely, the farm and university buildings located thereon, valued by him at $69,683.33. The following parts of his finding numbered 93 were reversed and stricken out: "But under and in pursuance of the Cornell contract of August 4, 1866, the whole net proceeds of the avails of said last-mentioned property, being the proceeds of the sale of said college land scrip, or lands located therewith, was at that time due or payable by Cornell University to the State of New York, and the total amount and value of the property had, held and owned by Cornell University, Sep-

tember 30, 1881, over and above its obligations to the State of New York, as defined by said contract, was $598,588.65." "Making the total funds which belonged to Cornell University, September 30, 1881, under section 5 of its charter, $598,588.65, and the total funds already realized and to be realized, only the right to the income of which at that date belonged to Cornell University, under section 6, was $2,690,-012.26." His finding numbered 95 was reversed and stricken out.

The judgment of the Supreme Court then went on to provide as follows:

"And it is further found, adjudged and decided by this court, in pursuance of the statute in such case made and provided that at the death of Jennie McGraw Fiske, September 30, 1881, the value of the farm and grounds on which the university buildings are located, consisting of about 260 acres, including the buildings and reservoir, was the sum of $400,-000.00, instead of 69,683.33, as found by the surrogate, and the total value of the items set forth in the finding of the surrogate numbered 75, including this last item, viz., $400,000.00, was $928,905.32.

"And it is further found, decided and adjudged by this court, that the property of the Cornell University which was held and owned by it when Jennie McGraw Fiske died, on the 30th day of September, 1881, amounted in value to the sum of $3,015,414.71, made up as follows:

"Funds derived from individuals, described in the
    75th finding of fact, (excluding the last item
    thereof,) as valued by the surrogate   .   .   .  $528,905 32
"The last item in said finding, viz., farm of
    about 260 acres and university buildings, as
    valued by this court  .   .   .   .   .   .   .   .   .   400,000 00
"Property derived from Cornell contracts with
    the State, as valued by the surrogate in his
    findings:
"Western lands   .   .   .   .   .   .   .   .   .   .   .   1,648,178 56

" Western land contracts . . . . . . . . . $439,334 22
" Cornell endowment fund . . . . . . . . . 128,596 61

          " Total . . . . . . . . . . . . . . . $3,145,014 71
" Less amount due to the college Land Scrip
     Fund, for the last 30 cents an acre on 432,000
     acres . . . . . . . . . . . . . . . . . 129,600 00

          " Balance . . . . . . . . . . . . . . . $3,015,414 71

" Making the total funds which belonged to Cornell University September 30th, 1881, under section five of its charter, $3,015,414.71.

" And it is further found, decided and adjudged that there was at that time due to the College Land Scrip Fund, and to be treated as a part thereof, the sum of $129,600 mentioned above.

" And it is further found, decided and adjudged that the College Land Scrip Fund, consisting of $473,402.87, together with the sum of $129,600, as found above, is not the property of Cornell University, and should not be reckoned or included as a part thereof, or subject to its charter limitation.

" And this court does further find and decide, that, at the date of the death of said Jennie McGraw Fiske, the said Cornell University held and owned real and personal property, of which the yearly income or revenue was more than ($25,000) twenty-five thousand dollars, exclusive of the College Land Scrip Fund then held by the Comptroller of the State of New York for the benefit of said university, and such yearly income and revenue was derived in part from lands and avails of sales of land which came to Cornell University through the Cornell contract of August 4, 1866.

" And it is further found, decided and adjudged by this court, that at the time of the death of Jennie McGraw Fiske the Cornell University had already reached the limit of property prescribed by its charter, as found above, and was not entitled to and could not take or hold any of the property or funds devised or bequeathed to it by her last will and testa-

ment, and never had any right, title or interest in or to the same or any part thereof; and that at her decease, the legal right and title in and to all of the property and funds so devised and bequeathed by her to the Cornell University passed to and vested in the appellants, according to their several rights therein as between themselves, as the same may hereafter appear."

The judgment then went on to reverse the surrogate's decree of May 25, 1886, with costs to be paid by the executor out of the funds of the estate, and to order the proceedings to be remitted to the surrogate, and that he enter a decree in conformity with the judgment of the Supreme Court, and make a distribution to the appellants according to their respective rights, as between themselves, they having already agreed upon such rights, of all the property in the hands of the executor of Mrs. Fiske, after paying debts, expenses and legacies other than those to Cornell University, together with all the property and funds which had come into the possession of the executor, and which he had delivered or paid over to Cornell University; and that the university restore into his hands all money and property received from him, and all dividends, interest and income therefrom, received by the university, less any expenses necessarily incurred in investing and managing the same; and that the surrogate ascertain and fix the amount so received by the university from the executor, with the gains, profits and income thereof, less such expenses, and enforce restitution of the same to the executor, by a decree.

Boardman, as executor of John McGraw and of Mrs. Fiske, and also Cornell University, appealed to the Court of Appeals of the State of New York from the judgment of December 14, 1887. The Court of Appeals affirmed the judgment and a remittitur from that court having been sent to the Supreme Court an order was entered in the latter court on the 12th of December, 1888, making the judgment of the Court of Appeals the judgment of the Supreme Court, and awarding the costs of the Court of Appeals against the executor and the university.

The opinion of the Court of Appeals, delivered by Judge Peckham, is reported in 111 N. Y. 66. The judges were unanimous, except that Judge Finch took no part. Cornell University, and Boardman, as executor of John McGraw and of Mrs. Fiske, have brought the case to this court by a writ of error, directed to the Supreme Court of the State of New York.

*Mr. Edwin Countryman* (with whom was *Mr. Samuel C. Halliday* on the brief) for plaintiffs in error.

*Mr. Esek Cowen*, for defendants in error, argued upon the jurisdiction of the court, and upon the merits of the case. On the question of jurisdiction he contended as follows:

I. In the proceedings below, Cornell University did not "claim" any "right, title, privilege or immunity," under any statute of the United States, or which was, directly or indirectly, derived from such statute.

Omitting provisions irrelevant to this case, section 709 of the Revised Statutes confers upon this court the right to review the decision of the highest court of a State, "where any title, right, privilege or immunity is claimed under . . . any statute . . . of the United States, and the decision is against the title, right, privilege or immunity, specially set up, or claimed by either party." It will be seen that the power of review is given only as to a judgment or decree, in a suit, "*where*" (that is, "in which") is claimed such title, right, privilege or immunity. The university has never in this proceeding, or otherwise, claimed any right, privilege or immunity, directly or remotely, derived from any act of Congress. It is an artificial person created by a New York statute, and must look to its charter for all its "rights, privileges and immunities." On the other hand, it does own certain lands and land contracts, the *title* to which is clearly derived from the act of Congress, granting lands to the several States for educational purposes.

But it is equally clear that the university did not claim

these lands *in the suit or proceeding* that is brought here by this writ. What the university claimed in that proceeding, what the court below denied, was the title to certain personal property formerly belonging to Mrs. Fiske and her father, and not at all the lands derived from the United States. The position of the plaintiffs in error seems to be that an appeal lies to this court whenever a state court has construed a federal statute contrary to the contention of either of the parties. But that is not the meaning of the law. A mere construction of an act of Congress by the state court does not give this court jurisdiction. One of the parties must have asserted ome right, *derived from such statute,* and must have been deprived of that right by the decision of the state court.

"It is not every misconstruction of an act of Congress by a state court that will give this court appellate jurisdiction. It is where the party claims some title, right, privilege or exemption *under an act of Congress,* and the decision is against such right, title, privilege or exemption." *Montgomery* v. *Hernandez,* 12 Wheat. 129, 132. See also *Menard* v. *Aspasia,* 5 Pet. 505, 517; *Bowman* v. *Chicago & Northwestern Railway Co.,* 115 U. S. 611.

II. Even if the judgment of the court below were binding as between Cornell University and the State of New York, (which is a stranger to these proceedings,) the title of the university to the lands and land contracts conveyed to it by Ezra Cornell, and which it *does* hold under the act of Congress, has been *affirmed,* not denied by the state court.

It must be remembered that the duty of the State of New York as trustee, to Cornell University, or to the United States as creator of the trust, was not in any sense before the court below. The sole question was one of *title.* Was Cornell University the owner of the lands and contracts conveyed to it by Ezra Cornell within the meaning of the charter of that corporation?

In order to give this court jurisdiction under Rev. Stat. § 709, the plaintiff in error must have claimed some right or title, etc., under the Constitution, or under a treaty or law of the United States, and such right or title, etc., must have been

denied by the state court.   No principle is better settled than that no appeal lies where the right or title claimed has been affirmed by the state court.   *Commonwealth Bank* v. *Griffith*, 14 Pet. 56; *Burke* v. *Gaines*, 19 How. 388; *Ryan* v. *Thomas*, 4 Wall. 603.   In the case at bar the Cornell University did not claim in the state court any right or title under any statute of the United States, and no such right or title was, in any manner, affected by the judgment; and furthermore, that an apparent title to property, derived from the United States through an act of Congress, having by chance come in question, the decision of the state court was *in favor* of that title.

III.   Assuming, as before, (what is not the fact,) that the decision below was binding as between the Cornell University and the State of New York, and that the right of the university to the lands and contracts conveyed to it by Ezra Cornell was involved in the proceeding below, still the appeal would not lie, for the state court decided not against the title of the University, but *against the title of the State of New York.*

It has been settled by repeated decisions of this court that to sustain a writ of error to a state court the latter tribunal must have denied some "right, title, privilege or immunity" claimed by the plaintiff in error *in his own right.*   It is not enough that the plaintiff in error claims that such title, etc., is given to *another* by the Federal Constitution, treaty or statute, even when the denial of that right to such other person has resulted in a judgment adverse to the plaintiff in error. *Long* v. *Converse*, 91 U. S. 105; *Miller* v. *Lancaster Bank*, 106 U. S. 542; *Henderson* v. *Tennessee*, 10 How. 311; *Owings* v. *Norwood*, 5 Cranch, 344.

IV.   The decision of the Court of Appeals of the State of New York did not affirm the validity of any statute of the State of New York claimed by the plaintiffs in error to be in contravention of any law of Congress, nor was the validity of any such statute "drawn in question" in the court below.

V.   The plaintiffs in error did not "draw in question" in the state courts the validity of any authority exercised by or under the State of New York, nor was there any decision in the state court in favor of an authority so exercised and questioned by them.

The state courts, in deciding upon the title to this fund, did not pass upon the validity of any statute of the State of New York, for no such question was before them; and the validity of the contract between Ezra Cornell and the State was not "drawn in question" by the plaintiffs in error, for they admitted and asserted its validity, and its invalidity would have been fatal to the case they were seeking to make.

But the act of Congress and its effect upon the *construction* of the Cornell contract *were* drawn in question. The counsel for the university insisted that, by virtue of the Cornell contract, the university, as assignee of Ezra Cornell, was bound to pay the net proceeds of the lands located by him into the treasury of the State, and that such proceeds being part of the purchase price of the land scrip, would, under the act of Congress, belong, when paid in, to the fund created by that act, which the State had agreed to accept and hold.

They argued, therefore, that the ultimate *title* to the fund was not in the university, but in the State of New York. Upon this point the decision was against them. The state courts did not deny a title claimed by the university under any law of Congress, but affirmed a title which the university attempted to disclaim. It denied a title, which the plaintiffs in error asserted to be in the State of New York, a third person, not a party to the proceedings.

But these decisions do not come within the statute allowing an appeal to this court. The writ of error should, therefore, be dismissed for want of jurisdiction.

VI. The case is not appealable because there are other grounds aside from the construction of the act of Congress of which the plaintiffs in error complain, on which the Court of Appeals based its conclusion, and which would have led to the same result if the construction of the plaintiffs in error had been adopted by the court.

The state court was certainly at liberty to hold, upon general principles of law, that, assuming that the relation of trustee and *cestui que trust* existed between the State of New York and Cornell University, the latter could not question acts of its trustee which had been done for its benefit and at

its special instance and request.   And the Court of Appeals
has, partially at least, placed its decision on this ground.
Judge Peckham, in delivering the opinion of the court, said:

"It is exceedingly doubtful, to my mind, whether the uni-
versity can be heard to claim the existence of this alleged
debt under the facts of this case.   The State has made and
makes no claim upon the university for the property, or any
portion of it.   It was placed in its possession by virtue of the
consent of the State, evidenced by the passage of an act au-
thorizing and directing it.   The university has claimed to be
the owner of it, and no one has drawn its rightful title in
question.   Can it now, while enjoying, without hostile claim
from any source, the full control of the property, as its abso-
lute owner, set up, as a reason why it should be allowed to
take other property, that, perhaps, hereafter, some one may
make a claim that the property does not belong to the uni-
versity, but that it is a trust fund, originating in the act of
Congress?   If the State or United States were to commence
some proceeding, based on the counsel's argument, to reclaim
possession of the property, there is nothing in the present
attitude of the university which would necessarily estop, or
in any way conclude it from denying that any such trust exists,
or that any case had been made for taking this property out
of its hands.   So far as appears, it seems that this assumed
indebtedness is entirely gratuitous on its part, and that there is
no creditor who makes the claim, no one who questions its
title.   It is going a good ways, under such circumstances, to
lay much weight on a liability which, up to this proceeding,
was never admitted by the university, and is not now asserted
by any one else.   It would seem as if property, which was
thus in the possession of the corporation, unclaimed by any-
one else, *was held by it within the meaning of its charter*, and
that the question with regard to the character of its holding
was merely an abstract one, with which courts would not
deal, at least so far as this proceeding is concerned."

Now, whether the Court of Appeals was right or wrong
in this position, it is one based on general principles of law,
and does not " draw in question " the construction of any act

of Congress. The decision is, that even if the act of Congress be so construed as to make the university a debtor to the State for the proceeds of the lands located by Ezra Cornell, it has been precluded, by its own conduct, from raising that question in these proceedings.

An appeal will not lie under section 709 of the Revised Statutes, if this court can see that the decision of the court below was, or may have been, placed upon some ground which did not involve the construction of the Federal Constitution, treaty or statute. *Ocean Ins. Co.* v. *Polleys*, 13 Pet. 157; *Steines* v. *Franklin County*, 14 Wall. 15; *Kennebec Railroad* v. *Portland Railroad*, 14 Wall. 23.

*Mr. George F. Comstock* argued for the defendants in error.

*Mr. S. S. Gregory* (with whom upon the brief were *Mr. James S. Harlan, Mr. William M. Booth* and *Mr. John G. Sears*) argued for defendants in error.

*Mr. George F. Edmunds,* for plaintiffs in error, in closing, after discussing the question of jurisdiction, said on the merits:

The act of Congress of 1862, 12 Stat. c. 130, 503, provided for aid to public instruction in the States a great fund in lands, if within the limits of the State, and, if not, in land scrip in other States, which the State owning the scrip could not locate in its own name, (this for obvious reasons,) but which it was provided should "be sold by said States, and the proceeds thereof applied to the uses and purposes prescribed in this act, and for no other use or purpose whatever." The act also provided that though the States should not locate their own scrip in other States, "their assignees may thus locate," etc. It was provided that the expenses of location, sale of scrip, etc., should be paid by the States, "so that the entire proceeds of the sale of said lands shall be applied, without any diminution whatever, to the purposes" of the act. These purposes were "the endowment, support and maintenance of at least one college, where the leading object shall be, without

excluding other scientific and classical studies, and including military tactics, to teach such branches of learning as are related to agriculture and the mechanic arts, in such a manner as the legislatures of the States may respectively prescribe, in order to promote the liberal and practical education of the industrial classes in the several pursuits and professions in life."

This foundation both in terms and intent was made upon the idea that the State accepting the donation should make the most and best it possibly could out of the lands and land scrip thus donated.

It was a trust that expressed and implied the highest degree of duty and diligence on the part of the State in obtaining the greatest possible fund that could be got out of the lands and scrip, for the purposes named.

Had it been a private trust between citizens, established in precisely the same phrases, no one would doubt that the donee who accepted the gift would be bound in every and the highest sense to realize the largest possible sum to the ends named.

The State, acting upon the duty and trust in the sense in which I have described it, on 27th April, 1865, passed the act establishing Cornell University. It was a public educational institution, whose governing authority was the chief officers of the State, but it was provided as a due and grateful memorial of the beneficence of Mr. Cornell in the foundation gifts as well as in what it was expected he would be able to do in realizing the largest possible sum out of the land scrip for the benefit of the institution, that the eldest male lineal descendant of Mr. Cornell should be *ex officio* a member. It was also provided, as had been stated in the title of the act, that the objects and educational proceedings of the corporation should be the very ones named in the donating act of Congress.

The foundation and activity, therefore, were the foundation and activity measured precisely by the provisions of the act of Congress.

The fifth section of the incorporation act authorized it to hold real and personal property to an amount not exceeding three million dollars; but it is agreed on all hands in this controversy that that limitation has no application to such prop-

erty as falls within the purview, and is subject to the operation of the donating act of Congress. This would be apparent on acknowledged principles if the state act itself had made no further provision, but, having thus limited the general and disposable property of the corporation, it proceeded without limit to provide for all the funds that could be obtained from the land scrip, amounting to 990,000 acres.

The sixth section declared that "the income, revenue and avails, which shall be received from the investment of the proceeds of the sale of the lands, or of the scrip thereof, or any part thereof," should be paid over to the university for the purpose before named.

The seventh section provided that the trustees should fulfil the requirements of the act of Congress in respect of the buildings, etc., as part of their duty in connection with taking the fund.

The next step was the act of New York, 10th April, 1866, which provided that the comptroller should fix the price of the scrip at not less than thirty cents per acre; that he might contract for the sale thereof with the trustees of the university. It provided, further, that the trustees might make contracts to the effect that "the *whole net avails and profits from the sale of land . . . located under said scrip* shall, from time to time, as such net avails and profits are received, be paid over and devoted to the purposes of such institution, . . . in accordance with the provisions of the act of Congress hereinbefore mentioned." The act then required that *the persons to whom the scrip* " *shall be sold shall report* to the comptroller annually, under such oath and in such form as the comptroller shall direct, the amount of land or scrip sold, prices at which the same have been sold and the amount of the money received therefor," etc.

The next section provided that the comptroller should have the power of examination into the doings of the person to whom the scrip had been thus sold, in order to ascertain the net avails, etc., to the end of carrying out the purposes of the act.

The next step in the history of the transaction is the act

of New York' of 24th of April, 1867, amending the charter
of the university, the 7th section of which required that the
trustees of the university taking the benefit of the act should
comply with the act of Congress in respect of the buildings,
etc., and that "they shall make all reports, and perform such
other acts as may be necessary to conform to the act of Con-
gress aforesaid."

On the 22d July, 1867, the comptroller reported to the con-
stitutional convention of New York the history of the matter
down to that time, from which it appeared that Mr. Cornell
had proposed to take the land scrip and to deal with it for
the benefit of the university, beginning at thirty cents an
acre and all profits, and thirty cents more per acre to be
added to the college fund, etc., and the balance of said
profits to be placed in a separate fund, to be known as the
Cornell Endowment Fund, and to be preserved and invested
for the benefit of said institution, and the income derived
therefrom to be paid over annually to the trustees of the said
university for the general purposes of said institution.

" *The general purposes* " *of the institution were precisely
those, and none other, that the donating act of Congress had re-
quired that the avails of the land scrip should be devoted to.*

The arrangement, then, instead of being a compensation or
commission to Mr. Cornell for undertaking the enterprise of
disposing of the scrip, was an arrangement precisely to the
ends declared by the act of Congress; and the separation of
the avails, and the giving a name to a part of them was
simply the tribute that was justly due Mr. Cornell in respect
of his contributions and exertions to the beneficent end con-
templated. Things and obligations remain the same — names
and ornaments were laid on to these things for the honor of
the name of Mr. Cornell. That was all. The substance was
the same.

It is obvious, then, if clear language can express clear inten-
tions, that the State intended and Cornell agreed that in
putting the disposition of the scrip into his hands, all the
money that could be derived from the disposition of the scrip
should be devoted to the purposes of the institution. That

part of it mentioned as attributable to the "Cornell Endowment Fund" was only a phrase of honor to the name and efforts of Cornell in realizing the largest possible sum for the beneficent ends designed by the act of Congress. There is no word, hint or symptom that the sum attributable to the Cornell Endowment Fund was to be considered as a compensation to Cornell, as the agent or contractor of. or with the State, for his service in disposing of the scrip. Had there been any such statement or implication, it would have been, on the face of it, an apparent fraud on the donor, for the sum expected to be realized and that was in fact realized, would be out of all proportion to any honest arrangement in respect of payment for services or responsibilities in the affair.

Under this arrangement between the State and Mr. Cornell, and pursuant to the law and authority of the State then in force and no other. Mr. Cornell disposed of the scrip and realized therefrom the large sums of money that have become, in the practical sense, the pivot on which this case turns. This realization of funds and income took place before the subsequent steps in respect of legislation or contract were taken.

Under the law and agreement before mentioned Mr. Cornell then went on, took the scrip, located and sold it from time to time, and then on 4th May, 1868, the legislature of New York enacted that the moneys in question in excess of the sixty cents per acre before referred to, " which excess, in pursuance of a contract made with Ezra Cornell by the commissioners of the land office bearing date 4th August, 1866, is set apart and constituted a separate and distinct fund, to be known as the ' Cornell Endowment Fund,' shall from time to time," etc., be invested. This investment, it is true, was not such an investment as the act of Congress appeared to require, but the income was to be devoted to the uses of the university, which uses, as before stated, were precisely and only those named in the act of Congress.

Whether the State, in providing for a different investment from that which the act of Congress required, was guilty of a breach of trust or duty, is a question quite apart from the nature of the fund. The fact that a trustee misinvests the

funds confided to him does not alter the character of the trust or fund.

Following all this, in 1869 the Comptroller of the State reported the receipts from both the classes of moneys — "College Land Scrip Fund," "Cornell Endowment Fund" — as the fruits of the sale of scrip under the act of Congress, and stated the account accordingly.

The Comptroller of the State from time to time reported to the legislature the state of the accumulations under these two heads and called attention to the possibility that the State was not, in form, at least, conforming to the act of Congress in dealing with the avails of the sales of scrip in the very respect of the Cornell endowment fund matter — chiefly as it respected expenses, etc. But continually, as it appears from the official records, all the money that Mr. Cornell got in from the sale of scrip was turned over to the State in accordance with this contract, and for the purposes before named. And this was in pursuance of the acts of the legislature of New York from time to time passed on the subject. That of May 4, 1868, provided for the disposition of the "excess" arising under the contract with Cornell, and set that money apart as under state authority, and, referring to the donating act of Congress as its foundation, provided that it should be invested to the end contemplated by the act of Congress, although the mode of the investment authorized differed from the limitations of the act of Congress, but it required that the fund should still be held and devoted to the purposes of the institution, which purposes, as before stated, were precisely and no other than those mentioned in the donating act of Congress.

The sale of the scrip accordingly went on, and the money came in and was duly accounted for accordingly. There was yet left some unlocated or unrealized scrip, and Mr. Cornell, apparently becoming tired of the drudgery and detail concerning the affair, desired that his authority and mission should be turned over to the university itself. Accordingly the State, by an act of 18th May, 1880, directed the comptroller to turn over to the university all the funds, securities, etc., known as belonging to the "Cornell Endowment Fund."

Due reports and operations were had accordingly, which appear in the state records.

The next and last act of the legislature upon the subject was that of 12th May, 1882, which provided for detail of the practical management, and also provided that the university might take and hold real and personal property to such an amount as should become necessary for the proper conduct and support of the several departments of education before mentioned.

[This act was *post hoc*, and cannot perhaps be held to affect the validity of a devise depending upon the death of a person that had theretofore happened, but it was certainly, so far as the legislative power could do it, a waiver of any of the public considerations that entered into the limitation of the amount the university could hold under its charter.]

The case then, on its merits, (the very merits upon which the Court of Appeals of New York determined it,) depends upon the question whether, in view of what had transpired, the money obtained from the sale of the land scrip over which Mr. Cornell had never at any time any personal control, belonged and was subject to the trusts and purposes declared in the act of Congress, or not.

If, in the same course of disposition, the State of New York had dealt in the same way with Mr. Cornell, but had provided that the excess above the minimum price should be paid into its treasury, for the general purposes of the expenditures of the State, it could not, I take it, be thought by anybody that such a disposition could separate that money from the trust. Nor can it, I think, be doubted that, if the same donation had been made to any private person and upon the same conditions, and he had made the same engagements with another that the State did with Cornell, he could not require that the so-called " excess " above the minimum price fixed, should be paid to him for his own private use.

I submit, therefore, that it is perfectly clear (needing no citations of authorities upon the law of trusts) that the whole of the moneys derived in the way before stated, were trust moneys and belonging to a trust fund, and having no connec-

tion or relation with the limitations of the amount of property that the university might hold provided in its charter.

The fact that a donee or trustee happens to be a corporation, private or public, does not, in the least, change the nature and character of the trust.

The fact, so much relied upon on the other side, that the State provided for other modes of investment than those mentioned in the act of Congress cannot have any bearing upon the intrinsic nature of the trust itself. To hold that it can, will be to hold that a trustee may change the nature and responsibility of his duties under a trust by a misinvestment.

Mr. Justice Blatchford, having stated the case as above reported, delivered the opinion of the court.

The questions for consideration here fall within a narrow compass, for they can embrace only federal questions.

The Court of Appeals, in its opinion, discussed only two questions, (1) whether Cornell University had power to take and hold property of the value of more than $3,000,000; and (2) if it had no such power, whether it held real and personal property in the aggregate up to such limit, at the time of the death of Mrs. Fiske, on the 30th of September, 1881.

The first question was examined most elaborately by that court; and it arrived at the conclusions that the university had no power to take or hold any more real and personal property than $3,000,000 in the aggregate, at the time of the death of Mrs. Fiske; and that, under the jurisprudence of the State of New York, her husband and her heirs at law and next of kin had a right to avail themselves of the fact, if it existed, in the controversy before the court, that at the time of her death, on the 30th of September, 1881, the university already held real and personal property up to the prescribed limit. The propositions thus decided by the Court of Appeals do not involve any federal question. They depend entirely upon the construction of the provisions of the charter of the university, and upon the municipal law of the State of New York. The decision upon those questions is binding upon this

court in the present case. Therefore, the only question subject to review by us is whether the property held by the university prior to and at the time of the death of Mrs. Fiske, on the 30th of September, 1881, exceeded the amount which by law it could hold, if a federal question is involved in that proposition. The Court of Appeals decided that the property so held by the university exceeded $3,000,000.

It is contended by the defendants in error that in the proceedings in the state courts the university did not " claim " any " title, right, privilege or immunity," under any statute of the United States, or which was derived directly or indirectly from any such statute; that, even if the judgment of the Court of Appeals was binding as between the university and the State, the latter being a stranger to the proceeding, the title of the university to the lands and land contracts conveyed to it by Cornell, if held under the act of Congress involved in the controversy, has been affirmed, and not denied, by the state court; that, assuming that the decision of the Court of Appeals was binding as between the university and the State, and that the right of the university to the lands and contracts conveyed to it by Cornell was involved in the proceeding, still the writ of error will not lie, because the state court decided, not against the title of the university, but against the title of the State; that the decision of the Court of Appeals did not affirm the validity of any statute of the State which the plaintiffs in error claimed to be in contravention of any act of Congress, nor was the validity of any such statute " drawn in question " in that court ; that the plaintiffs in error did not draw in question, in the state court, the validity of any authority exercised by or under the State, nor was there any decision in the state court in favor of an authority so exercised, and so questioned by the plaintiffs in error; and that, aside from any construction of the act of Congress of which the plaintiffs in error complain as that on which the Court of Appeals based any conclusion, there were other grounds which would have led to the same result, if the construction of such act of Congress insisted upon by the plaintiffs in error had been adopted by the court.

On the other hand, it is insisted by the plaintiffs in error, that this court has jurisdiction to review the judgment of the state court, under the second clause of section 709 of the Revised Statutes, because there was drawn in question the validity of statutes of the State of New York and of an authority exercised under those statutes, on the ground of their being repugnant, as they were finally construed by the state court, to the provisions of an act of Congress.

Without discussing this question of jurisdiction, it is sufficient to say, that a majority of the court are of opinion that this court has jurisdiction. As our conclusion is that the judgment of the state court must be affirmed, it is not important to discuss at any length the question of jurisdiction, because, whether the writ of error is dismissed, or whether the judgment is affirmed, the result is the same, of allowing the judgment of the state court to stand in full force.

We proceed now to give our views as to the case upon its merits. The conclusion of the Court of Appeals, in its concurrence with the Supreme Court, that the property of the university exceeded $3,000,000, was based upon the modifications made by the Supreme Court, in its judgment, of the finding of the surrogate as to the value of the buildings and grounds. The Court of Appeals, in its opinion (p. 131), states that it agrees with the Supreme Court in those modifications, although it was probably bound by the findings of that court, as there was contradictory evidence in regard to such value. This court certainly is bound by the findings of the Supreme Court and of the Court of Appeals on that subject. The remainder of the questions before us depends wholly upon documentary evidence, and upon the construction of statutes and of written papers.

The Court of Appeals, in approaching the question as to whether the property in controversy, if taken and held by the university, would exceed the amount which by law it could hold, says (p. 113): " The decision of such question depends partly upon the view which should be taken of the character of the holding under which the university now possesses certain property, which is described in the finding of the sur-

rogate as property derived from the nation and State, and which he finds amounted to $2,088,012.78, and which was made up, as he also finds, of Western land contracts, $439,-834.22, and of Western lands to the amount of $1,648,178.56; and he states, as part of his finding, that this total of $2,088,-012.78 was due or payable by the university to the State, or, in other words, that the university owed the State that sum, and consequently it should not be regarded as any part of its property. This finding has not been concurred in by the general term, which has modified it by holding that the same is to be taken into account as part of the property of the university. The state of facts under which the question arises is undisputed, and it becomes a question of law as to what is the proper legal inference to be drawn from the undisputed facts, and the decision of that question is reviewable in this court."

On the 2d of July, 1862, Congress passed the following act (12 Stat. 503, c. 130):

"An act donating public lands to the several States and Territories which may provide colleges for the benefit of agriculture and the mechanic arts.

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That there be granted to the several States, for the purposes hereinafter mentioned, an amount of public land, to be apportioned to each State a quantity equal to thirty thousand acres for each senator and representative in Congress to which the States are respectively entitled by the apportionment under the census of eighteen hundred and sixty : *Provided,* That no mineral lands shall be selected or purchased under the provisions of this act.

"SEC. 2. *And be it further enacted,* That the land aforesaid, after being surveyed, shall be apportioned to the several States in sections or subdivisions of sections, not less than one-quarter of a section ; and whenever there are public lands in a State subject to sale at private entry at one dollar and twenty-five cents per acre, the quantity to which said State shall be entitled shall be selected from such lands within the limits of such State, and the Secretary of the Interior is hereby directed,.

to issue to each of the States in which there is not the quantity of public lands subject to sale at private entry at one dollar and twenty-five cents per acre, to which said State may be entitled under the provisions of this act, land scrip to the amount in acres for the deficiency of its distributive share; said scrip to be sold by said States, and the proceeds thereof applied to the uses and purposes prescribed in this act, and for no other use or purpose whatsoever: *Provided,* That in no case shall any State to which land scrip may thus be issued be allowed to locate the same within the limits of any other State, or of any Territory of the United States; but their assignees may thus locate said land scrip upon any of the unappropriated lands of the United States subject to sale at private entry at one dollar and twenty-five cents, or less, per acre: *And provided, further,* That not more than one million acres shall be located by such assignees in any one of the States: *And provided, further,* That no such location shall be made before one year from the passage of this act.

" Sec. 3. *And be it further enacted,* That all the expenses of management, superintendence, and taxes from date of selection of said lands, previous to their sales, and all expenses incurred in the management and disbursement of the moneys which may be received therefrom, shall be paid by the States to which they may belong, out of the treasury of said States, so that the entire proceeds of the sale of said lands shall be applied without any diminution whatever to the purposes hereinafter mentioned.

" Sec. 4. *And be it further enacted,* That all moneys derived from the sale of the lands aforesaid by the States to which the lands are apportioned, and from the sales of land scrip hereinbefore provided for, shall be invested in stocks of the United States, or of the States, or some other safe stocks, yielding not less than five per centum upon the par value of said stocks; and that the moneys so invested shall constitute a perpetual fund, the capital of which shall remain forever undiminished, (except so far as may be provided in section fifth of this act,) and the interest of which shall be inviolably appropriated, by each State which may take and claim the benefit of this act,

to the endowment, support and maintenance of at least one college where the leading object shall be, without excluding other scientific and classical studies, and including military tactics, to teach such branches of learning as are related to agriculture and the mechanic arts, in such manner as the legislatures of the States may respectively prescribe, in order to promote the liberal and practical education of the industrial classes in the several pursuits and professions in life.

"Sec. 5. *And be it further enacted*, That the grant of land and land scrip hereby authorized shall be made on the following conditions, to which, as well as to the provisions hereinbefore contained, the previous assent of the several States shall be signified by legislative acts:

"First. If any portion of the fund invested, as provided by the foregoing section, or any portion of the interest thereon, shall, by any action or contingency, be diminished or lost, it shall be replaced by the State to which it belongs, so that the capital of the fund shall remain forever undiminished; and the annual interest shall be regularly applied without diminution to the purposes mentioned in the fourth section of this act, except that a sum, not exceeding ten per centum upon the amount received by any State under the provisions of this act, may be expended for the purchase of lands for sites or experimental farms, whenever authorized by the respective legislatures of said States.

"Second. No portion of said fund, nor the interest thereon, shall be applied, directly or indirectly, under any pretence whatever, to the purchase, erection, preservation, or repair of any building or buildings.

"Third. Any State which may take and claim the benefit of the provisions of this act shall provide, within five years, at least not less than one college, as described in the fourth section of this act, or the grant to such State shall cease; and said State shall be bound to pay the United States the amount received of any lands previously sold, and that the title to purchasers under the State shall be valid.

"Fourth. An annual report shall be made regarding the progress of each college, recording any improvements and exper-

iments made, with their costs and results, and such other matters, including state industrial and economical statistics, as may be supposed useful: one copy of which shall be transmitted by mail free, by each, to all the other colleges which may be endowed under the provisions of this act, and also one copy to the Secretary of the Interior.

"Fifth. When lands shall be selected from those which have been raised to double the minimum price, in consequence of railroad grants, they shall be computed to the States at the maximum price, and the number of acres proportionally diminished.

"Sixth. No State while in a condition of rebellion or insurrection against the government of the United States shall be entitled to the benefit of this act.

"Seventh. No State shall be entitled to the benefits of this act unless it shall express its acceptance thereof by its legislature within two years from the date of its approval by the President.

"SEC. 6. *And be it further enacted,* That land scrip issued under the provisions of this act shall not be subject to location until after the first day of January, one thousand eight hundred and sixty-three.

"SEC. 7. *And be it further enacted,* That the land officers shall receive the same fees for locating land scrip issued under the provisions of this act as is now allowed for the location of military bounty land warrants under existing laws; *Provided,* Their maximum compensation shall not be thereby increased.

"SEC. 8. *And be it further enacted,* That the governors of the several States to which scrip shall be issued under this act shall be required to report annually to Congress all sales made of such scrip until the whole shall be disposed of, the amount received for the same, and what appropriation has been made of the proceeds."

On the 5th of May, 1863, the legislature of the State of New York passed an act, (Laws of New York of 1863, c. 460,) entitled "An act relative to the lands granted to this State by the act of Congress entitled 'An act donating public lands to the several States and Territories which may provide

colleges for the benefit of agriculture and the mechanic arts,' approved second July, eighteen hundred and sixty-two, and authorizing the sale thereof, and the investment of the proceeds of such sales." By this act, the State duly accepted the grant and gave its assent to the conditions thereof. The Comptroller was authorized to receive the land scrip, (as the State had no public lands of the United States, unappropriated, within its borders,) and to sell the same, and to make all necessary arrangements, employ agents, etc., as he deemed expedient, for effecting a judicious sale of such scrip. Land scrip representing 989,920 acres of land was then issued by the Secretary of the Interior to the Comptroller, and was embraced in 6187 pieces of scrip for 160 acres each. The Comptroller sold scrip for 68,000 acres at the rate of 85 cents an acre, and for 8000 at 83 cents an acre.

By an act passed May 14, 1863, (Laws of New York, of 1863, c. 511,) the legislature appropriated the income and revenue which might be received from the investment of the proceeds of the sale of any of the lands granted to the State by the act of Congress of July 2, 1862, to the People's College, located at Havana, in Schuyler County, on certain conditions expressed in the act.

On the 27th of April, 1865, (Laws of New York, of 1865, c. 585,) the legislature passed an act creating Cornell University as a corporation, and appropriating to it the "income, revenue and avails which shall be received from the investment of the proceeds of the sale of the lands, or of the scrip therefor," granted to the State by the act of Congress of July 2, 1862, to be paid over to the trustees of the university "for its use and behoof; in the mode and for the purposes in said act of Congress defined." This gift was expressed in the act to be upon the condition that Ezra Cornell should give $500,000 to the university and $25,000 to the trustees of Genesee College, located at Lima, New York, and the provisions of the act were to take effect only in case of the non-compliance of the trustees of the People's College at Havana with the provisions of the act of May 14, 1863. Section 5 of the act of April 27, 1865, was in these words: "§ 5. The cor-

poration hereby created may hold real and personal property to an amount not exceeding three millions of dollars in the aggregate." Both of the gifts above specified were made by Mr. Cornell.

In this state of things, as the Court of Appeals says in its opinion (p. 116), "the great question then arising was in regard to the best means of disposing of such scrip for the best price, so that the income for the university should be increased to the greatest extent therefrom. The result of throwing into market such an enormous amount of the public lands as had been donated by Congress to the several States was a fall in the market value of the land, and, of course, of the scrip which represented it. In the fall of 1865, Mr. Cornell had purchased some scrip of the comptroller, representing 100,000 acres, for $50,000, and had given his bond for that sum upon condition that all the profits which should accrue from the sale of the land should be paid to the Cornell University."

The legislature then passed, on the 10th of April, 1866, an act (Laws of New York, of 1866, c. 481) entitled ".An act to authorize and facilitate the early disposition by the Comptroller of the lands or land scrip donated to this State by the United States," and which was in the following words:

"SECTION 1. The Comptroller is hereby authorized to fix the price at which he will sell and dispose of any or of all the lands or land scrip donated to this State by the United States of America, by act of Congress approved July second, eighteen hundred and sixty-two, and entitled 'An act donating public lands to the several States and Territories which may provide colleges for instruction in agriculture and the mechanic arts.' Such price shall not be less than at the rate of thirty cents per acre for said lands. He may contract for the sale thereof and sell the same to the trustees of the Cornell University. If the said trustees shall not agree with the said Comptroller for the purchase thereof, then the commissioners of the land office may receive from any person or persons an application for the purchase of the whole or any part thereof at the price so fixed by the said Comptroller, and may, if they are satisfied that the said person or persons will fully carry out and perform

the agreement hereinafter mentioned, sell the same or any part thereof to the said person or persons. But said trustees or such person or persons shall at the same time make an agreement and give security for the performance thereof to the satisfaction of the Comptroller, to the effect that the whole net avails and profits from the sale of scrip or the location and use by the said trustees, person or persons, of the said lands or of the lands located under said scrip, shall from time to time, as such net avails or profits are received, be paid over and devoted to the purposes of such institution or institutions as have been or shall be created by the act chapter five hundred and eighty-five of the laws of eighteen hundred and sixty-five, of the State of New York, in accordance with the provisions of the act of Congress hereinbefore mentioned. And the said trustees, person or persons to whom the said lands or scrip shall be sold, shall report to the Comptroller annually, under such oath and in such form as the Comptroller shall direct, the amount of land or scrip sold, the prices at which the same have been sold, and the amount of money received therefor, and the amount of expenses incurred in the location and sale thereof.

"§ 2. The Comptroller is authorized from time to time as he shall see fit, to make such examination into the actions and doings of his vendees of said lands or scrip therewith as he shall deem necessary to ascertain and determine what are the net avails of the said lands or scrip from the sale or from the location and use thereof by his said vendees.

"§ 3. This act shall take effect immediately."

Under this act, the Comptroller fixed the price of the land at fifty cents per acre, which, under all the circumstances, was considered a fair amount. The trustees of the university did not apply to purchase the scrip under the act of 1866, and on the 4th of August, 1866, the commissioners of the land office made an agreement with Ezra Cornell for the sale to him of all the remaining scrip undisposed of, represented by 5087 certificates of 160 acres each. The agreement was entered into between the commissioners and Mr. Cornell, under the authority of the above act of 1866, and was in these words:

"This agreement, made this fourth day of August, eighteen hundred and sixty-six, between the People of the State of New York, through their commissioners of the land office, acting under and by virtue of chapter 481 of the Laws of 1866, of the first part, and Ezra Cornell of Ithaca, N. Y., of the second part, witnesseth :

"That the said party of the first part hereby agrees to sell and assign and deliver to the party of the second part all of the agricultural land scrip now in the possession or ownership of the State of New York, consisting of five thousand and eighty-seven certificates, each representing one hundred and sixty acres, on the following terms and conditions :

"*First.* That said party of the second part shall receive said scrip, from time to time, as the same can be judiciously located, in parcels representing not less than twenty-five thousand acres, paying therefor into the treasury of the State, on its assignment and delivery to him by the Comptroller, at the rate of thirty cents per acre, in lawful money of the United States, or in the stocks of the United States, or of the State of New York, or in other good and safe stocks or bonds, to be approved by the Comptroller and drawing not less than five per cent interest per annum, and at the same time depositing with the Comptroller stocks or bonds to be approved by him, to an amount equal to an additional thirty cents per acre, as security for the fulfilment, by the party of the second part, of the conditions of this agreement, so far as they relate to the execution of a mortgage to the State on the land to be entered and located with said scrip, on the fulfilment of which said stock or bonds so deposited as security shall be returned to said party of the second part.

"*Second.* That whenever any parcel of scrip, sold and delivered to the said party of the second part, under and by virtue of this agreement, shall have been located by him or his agents, the said party of the second part hereby agrees that he will, without delay, furnish to the Commissioners of the Land Office of this State, or to some member thereof, to be designated by a resolution of the board, a full and complete list and description of the land so located. And said

Board of Commissioners shall, within at least sixty days thereafter, and from time to time subsequently as may be found expedient, affix a minimum valuation by quarter sections, at which the same may be sold by said party of the second part. And the said party of the second part further agrees, that he will annually, and from time to time, whenever required by the Commissioners of the Land Office, render, for their information, to the Comptroller, a full, just and true account of all sales and leases made by him, said report to be made in such form and under such oath as the Comptroller shall direct, and will pay into the treasury of the State the whole of the net profits arising therefrom, which shall be ascertained by deducting from the gross receipts on sales the original cost of thirty cents per acre, the cost and expenses attending the location, management and sale of said lands, the taxes assessed and paid on the same by the party of the second part, and the interest at the rate of seven per cent per annum on the several amounts actually expended and liabilities incurred for such purposes. But it is expressly agreed by the party of the second part that he will not sell any portion of said lands at a price below the minimum valuation thereon, which may from time to time be fixed by the Commissioners of the Land Office, without first obtaining their consent to do so in writing.

"*Third.* That the stipulations and conditions of this agreement shall apply to each and every parcel of scrip assigned and delivered to said party of the second part under this agreement, and the Comptroller shall defer or suspend further assignments and deliveries of scrip whenever the party of the second part fails to perform such stipulations and conditions in respect to any scrip sold and delivered to him under this agreement, until they have been complied with. Except, nevertheless, that stocks or bonds as security for the return and mortgage of lands located under scrip issued to the party of the second part, shall in no case be required when there shall remain in the hands of the Comptroller, by virtue of this agreement, mortgaged lands not released, equal in quantity to the scrip which may be issued to the party of the

second part, and remain not located and mortgaged as provided by this agreement.

"*Fourth.* That as often as and whenever the party of the second part shall furnish a description of any of the lands selected and located by him under and by virtue of said scrip, he shall immediately execute a mortgage thereon to the people of this State, to be approved by the Attorney General, conditioned that the said party of the second part will fully keep and perform each and every of the terms and conditions he is required to do, keep and perform. And this agreement is declared to be a continuing agreement, and a suit or suits at law or in equity may be from time to time instituted and maintained thereon, and upon any or all of said mortgages, for any violation of such terms and conditions, whenever such violation may occur. Said mortgages shall be delivered to the Comptroller, or to the Commissioners of the Land Office.

"*Fifth.* Whenever the party of the second part shall sell or dispose of any section of the lands acquired by him under this agreement, and pay into the treasury of the State the net profits resulting from such sale, after the deductions hereinbefore mentioned and provided for, the party of the first part shall execute and deliver to the party of the second part a full and sufficient release of the portion sold from the lien of the mortgage, so that a clear title can be vested in the purchaser or purchasers.

"*Sixth.* That of the moneys arising from sales or leases made by the party of the second part, and paid into the state treasury, as herein provided, a proportion equal to thirty cents per acre shall be added to and form a part of the fund known and designated on the records of the Comptroller's office as the 'College Land Scrip Fund,' and the remainder shall constitute a separate and distinct fund, which shall be the property of the Cornell University, to be known as the 'Cornell Endowment Fund,' the principal of which shall forever remain unimpaired, the income to be annually appropriated by the legislature, and paid over from time to time to the trustees of the Cornell University, to be by them devoted to the purposes of the institution.

"*Seventh*. That the said party of the second part further agrees to purchase the whole of the aforesaid scrip and select and locate lands under and by virtue thereof, and execute mortgages thereon as hereinbefore provided, within four years from the date hereof, and that he will sell the lands within twenty years from date, and pay the net profits arising from such sales into the treasury of this State, and until the same shall be so sold and the net profits so paid he will pay all taxes which may be assessed thereon, and preserve and maintain a title thereto unimpaired, to which the liens created by said mortgages shall attach. And if any event shall occur making it needful for the people of this State to incur any expense to preserve the lien of said mortgages, the same shall be paid out of the proceeds of the sales of said lands. And if, after the expiration of the period of four years hereinbefore fixed, any of said scrip shall remain with this State, and not have been paid for by the party of the second part, the same shall be released thereafter from the conditions and stipulations of this agreement."

The Court of Appeals says (p. 122): "There was no sum provided in the act of Congress for the sale of the scrip. It was in the discretion of the State to sell it at any price it could obtain, either at public or private sale; and it could sell the whole or any part of such scrip at any time, but the proceeds of such sale were to be invested under the act of Congress and the income applied as therein provided for. If there be any ambiguity in the meaning of the agreement as a whole, it is not improper to see what meaning was attached to it by the persons who executed it, if possible, and also to look at the surrounding facts, so that we may place ourselves in the same position as the contracting parties and thus learn what was in contemplation.

"It is known that at the time of the passage of the act of April 10, 1866, sales of the scrip had almost ceased. It was thought that there was a good chance that the land which might be located under this scrip would in the future greatly appreciate in value, and it was the wish of those interested in its welfare that the university should, in some way, reap the

benefit of this increase.  But it had no funds to purchase the scrip, and it needed ready money as an income to aid it in the discharge of its duties as an educational institution.  Hence the problem was to find some one who would purchase the scrip and pay for it, and then locate and sell the lands at the higher prices which it was hoped they would attain and give the profits to the university.  A glance at the correspondence between Mr. Cornell and the Comptroller, and at the minutes of the proceedings of the Land Commissioners, and the other evidence in the case, shows that there was no one else than Mr. Cornell who was ever thought of as a person who would take upon himself such burdens, troubles, labors and responsibilities, for the purpose of giving away all the profits which might, in the future, arise from such sales.  It is seen by reference to that correspondence that Mr. Cornell and the Comptroller differed in regard to the construction of the act, the Comptroller holding that the act really meant that the net avails of the scrip should be placed under the custody of the State, while it may be inferred that the idea of Mr. Cornell was that the *profits*, after paying the original thirty cents and the additional thirty cents (if realized) as the purchase price of the scrip, might be placed as he should choose, provided the university should receive the benefit of the whole income arising from such profits.  Under date of June 9, 1866, Mr. Cornell, in his letter to the Comptroller, speaks of his differing with the Comptroller in his construction of the law, but adds: 'Appreciating, as I do most fully, your motives for desiring to give the utmost possible security and permanency to the funds which are, in a great degree, to constitute the endowment of the Cornell University, I shall most cheerfully accept your views so far as to consent to place the entire profits, to be derived from the sale of the lands to be located with the college land scrip, in the treasury of the State, *if the State will receive the money as a separate fund from that which may be derived from the sale of scrip, and will keep it permanently invested and appropriate the proceeds from the income thereof annually to the Cornell University, subject to the direction of the trustees thereof, for the general purposes of said institution,*

*and not to hold it subject to the restrictions which the act of Congress places upon the fund derivable from the sale of the college land scrip or as a donation from the government of the United States, but as a donation from Ezra Cornell to the Cornell University.'*

" Mr. Cornell thus plainly understood that the purchase price of the scrip from the State was thirty cents an acre, with a possible thirty cents more if he should realize that sum on the sale of the land, and that any sum beyond that came to him as profits on his sale of the scrip or land to third parties, and that sum, being his own profits, he was willing to donate to the university, and for that purpose to pay the same into the treasury of the State, the same to be invested and the income therefrom to be paid by the State to the university for the general purposes of the institution, and not as part of the purchase price of the scrip to be invested under the act of Congress. It was after the receipt of this letter that the agreement was made, the subdivision six containing, in substance, the provision asked for by Mr. Cornell.

" While in some portions of this agreement, if read alone and laying aside all knowledge of the contemporary history of the events surrounding it, there might arise some doubt as to the meaning of such portion, yet when read as a whole and in the light of those events, I think no real and grave doubt can exist as to the meaning of this instrument. It seems clear to my mind that the State sold this land scrip at thirty cents per acre, with an additional thirty cents if so much should thereafter be realized upon the sale by the vendee of the State, and that this constitutes the purchase price of such scrip, which, when assigned to Mr. Cornell by the State, in accordance with the terms of the contract, he became the legal owner of. He, it is true, also agreed that his profits should be paid into the treasury of the State, but they were to be paid therein *as profits* and not as any portion of the purchase price of the scrip, and they were to be paid, and were in fact paid, as profits of Mr. Cornell, and they were received under that agreement as the property of the Cornell University, the income of which was to be paid to it for its general purposes,

and the principal was to constitute the Cornell endowment fund. I cannot see that in all this there was nothing but an agency created in behalf of the State, and that Mr. Cornell was such agent, and that the whole profits realized were really nothing but the proceeds of the sale of the lands by the State. The State, on the contrary, by the very terms of the agreement, sold the scrip, and the legal title, by patents from the government of the United States, was vested in Mr. Cornell when he located the lands under the scrip which he had purchased, and took out his patents upon such location. Neither can I see that the purchaser of the scrip gave or intended to give, or was supposed to give, his profits as part of such purchase price. His agreement is plain, and in it he stated what such purchase price was, and what he would give for the scrip, and the fact that he agreed to pay his profits, if any were realized, into the treasury of the State, as the property of the university, which was to have the income thereof paid over to it for its general purposes, does not, to my mind, render such profits any portion of the purchase price of the scrip. They were profits which he hoped to be able to realize in the future, but were entirely speculative in character and amount, dependent largely upon the judgment with which the lands were located, and the time and manner of their sale. All this Mr. Cornell was willing to do for this university, but the agreement shows that he was to do it as a gift of his own, and not as a mere agent of the State or of the United States; and that all the compensation he sought for his services, his trouble and his responsibilities, great and onerous as they were, was the fact that all this should go to the university as his gift, and the State become the custodian of the profits under a duty to appropriate the income to the trustees for the general purposes of the university.

"The counsel for the institution may be entirely right in his statements as to the law regarding this branch of the question, if he is right in the fundamental proposition as to the *profits* being a part of the purchase price or the avails of the sale of the scrip by the State; but until he can maintain the correctness of that proposition, I do not think his argu-

ment reaches the trouble. I do not think the proposition is correct. The profits were the avails of the sale of the scrip by Mr. Cornell, not in any sense the avails of the sale of the scrip by the State. I think, also, that the agreement is fully authorized by the act of April 10, 1866. It gives the right to the Commissioners of the Land Office to sell the scrip, or any part thereof, for the price which was to be fixed by the Comptroller, and not less than thirty cents per acre. The right to sell the scrip at the price fixed by the Comptroller was based upon the condition that the persons who purchased at such price should also agree to pay over the net avails or profits from the sale by them of the scrip or lands located under it, as they should be received, and that they should be 'devoted to the purposes of such institution or institutions as have been or shall be created by the act, chapter 585 of the laws of 1865,' (the charter of Cornell University,) in accordance with the provisions of the act of Congress before mentioned. This does not mean that all these possible profits are to be deposited in the state treasury, subject to the same rules that would obtain in the case of the purchase price of the scrip, but only that they shall be devoted to the institution created by the act of 1865, in accordance with the provisions of the act of Congress already mentioned. Of course the purchase price — that which was fixed by the Comptroller — was to go into the treasury and be invested as provided for by the act of Congress.

"The reference in the above section of the act of 1866 to such institution or institutions as have been or shall be created by the act, chapter 585 of the laws of 1865, can, of course, be to none but the Cornell University, and hence the provision in the agreement that the profits shall all be devoted to that institution was proper. As that university had complied with all the conditions imposed upon it by the State as a condition to its right to receive all the income from this fund, the right to it could not be taken from it. This the Commissioners of the Land Office stated in their report to the constitutional convention in answer to a request from that body for information as to this land scrip. And in this report, under date of

July 22, 1867, the Comptroller, as a member of the Board of Commissioners of the Land Office, and one of the officers who executed the contract with Mr. Cornell in August, 1866, stated as follows : 'In deciding what portion of the income of the money paid into the treasury under the agreement with Mr. Cornell would be subject to this limitation' (set forth in the act of Congress) 'as to its use and application, the Commissioners of the Land Office assumed that the prohibition applied only to the purchase-money received by the State on a sale of the scrip, and that the ultimate profits to be derived from the location and sale of the lands by the purchaser formed no part of the purchase-money, and need not, therefore, be included. The nominal price, however, which was fixed on the scrip by the act of 1866, and for which it was sold, in consideration of the stipulation to pay over the net profits, being less than the market rates, it was stipulated in the sixth section of the agreement that an additional thirty cents per acre from the net profits should, when such profits were paid into the treasury, be added to the purchase-money, thus increasing the price to sixty cents per acre, the current rate for the scrip at the date of the transaction, and limiting the purposes to which it may be applied in conformity with the terms of the grant by Congress.'

"Here, then, in addition to the language as used in the agreement itself, which when read as a whole seems to me quite plain, we find what Mr. Cornell was willing to do, as set forth in his letter to the Comptroller above quoted from, in which he claims the act permitted it, and he would donate the profits as a gift from himself to the university ; and we find in an official report of one of the officers executing the contract, speaking for himself and associates, what was their understanding of this agreement. From all sources, the agreement itself and the separate views of the parties to it, it appears the construction should be, and was, that the profits formed no part of the purchase price or the avails of the sale of the scrip by the State, (over the thirty cents per acre if realized,) and that such profits belonged to the university by the gift of Mr. Cornell, the vendee of the scrip from the State,

the income to be paid to the trustees of the university for the general purposes of the same."

By an act passed May 4, 1868, (Laws of New York, of 1868, c. 554,) the legislature authorized the Comptroller to invest the moneys which might be received in excess of sixty cents per acre, under the contract of August 4, 1866, and which thereunder went into " the Cornell Endowment Fund," not only in stocks of the United States or of the State of New York, or in some other safe stocks yielding not less than five per cent per annum on the par value thereof, (according to the restriction in section 4 of the act of Congress of July 2, 1862,) but also " on bonds secured by mortgage upon unincumbered real estate, situated within this State, worth at least double the amount secured by such mortgage." The statute also provided as follows : " The said fund and the interest and income thereof, subject to the expenses of the care and management of the same, shall be held for and devoted to the purposes of the said Cornell University, in pursuance of the contract before mentioned."

As to this statute, the Court of Appeals says (p. 127) : " This must be taken as a legislative recognition of the fact that the agreement of sale to Mr. Cornell was for thirty (possibly sixty) cents an acre, and that all profits belonged to Mr. Cornell, but that by an agreement he had agreed to give them to the university for the general purposes thereof. We cannot assume that the State would have run counter to the express provisions of the act of Congress, by enacting that the purchase price of the scrip might be invested in a manner forbidden by that act."

In 1873, the legislature appointed a commission consisting of William A. Wheeler, John D. Van Buren, and Horatio Seymour, to ascertain the condition of the land grant and to report whether the acts of Congress and of the legislature had been complied with in the sale and disposition of the lands. The first two named of the commissioners reported, in April, 1874, that the profits realized by Mr. Cornell from the sale of the lands formed part of the purchase price of the scrip, while Governor Seymour reported that he was of a contrary opinion.

The legislature ultimately, and by an act passed May 18, 1880, (Laws of New York, of 1880, c. 317,) directed the Comptroller, upon the request of Cornell University, to assign, transfer, pay and deliver to the latter " all moneys, securities, stocks, bonds and contracts, constituting a part of or relating to the fund known as the Cornell Endowment Fund, now held by the State for the use of said university." This was done because, under an agreement made between Ezra Cornell and his wife and the university, on the 13th of October, 1874, with the consent of the Comptroller and the Commissioners of the Land Office, Mr. Cornell and his wife had conveyed to the university all their rights under any agreement between him and the State relating to the land scrip or to any lands located or to be located under it, and the university had covenanted that it would assume and perform all the agreements made between him and the State in reference to the land scrip or the land, and would discharge his obligations held by the State. The university had paid to the State a part of the additional thirty cents per acre which the State was to receive, if realized, as the purchase price of the scrip.

On all these facts the Court of Appeals says, in its opinion (p. 128): " The State has made and makes no claim that any portion of these profits over the thirty cents an acre forms any portion of the purchase price of the sale of the scrip by it. The university, by its agreement with Mr. Cornell and by taking exactly his position, and by receiving the moneys and securities of the Cornell endowment fund by virtue of the act of 1880, clearly has taken the position that it was the owner of this fund, and was not indebted to the State therefor. Its reports show that they (the trustees of the university) claimed that it had no debts, and they acknowledged none to the State on account of this fund. If it existed, it would certainly be a somewhat onerous position for the State to be in. It must have all the proceeds of the sale of this scrip, including in such case all the profits of the past and what may hereafter arise; it must pay all expenses, etc., after location, in the way of taxes, and all incurred in the management and disbursement of the moneys, and must invest in stocks of the kind

described in the act of Congress, and must forever guarantee the whole amount, so that if any of the principal is lost it must be supplied by the State, and it must pay over the five per cent interest on the whole of this fund to the university. This, of course, does not weigh in case the decision were that the law is in that condition. For the reasons already given, I do not think it is."

On the question whether the legislation of New York, or the agreement of August 4, 1866, was in violation of the act of Congress, the Court of Appeals says (p. 129): "Interpreted as we have interpreted the agreement and the act of the legislature of New York, the remaining inquiry is, does the New York statute, or the agreement under it, run counter to the act of Congress creating this land scrip trust? I think not. It provides that all moneys derived from the sale of the land scrip by the State shall be invested, etc., as therein prescribed. The scrip is to be sold by the State, which could not itself locate the land, and the avails of such sale are to be invested. The avails of the sale of the scrip by the State were the purchase price thereof; and if I am right, that the profits formed no part of such purchase price, but were the property of the vendee of the State, which *he* agreed to give to the university for general purposes, as his gift and to form the property of the university, then the act of Congress has no concern with it.

"Another consideration may be adverted to. It is exceedingly doubtful, in my mind, whether the university can be heard to claim the existence of this alleged debt under the facts of this case. The State has made, and makes, no claim upon the university for the property or any portion of it. It was placed in its possession by virtue of the consent of the State, evidenced by the passage of an act authorizing and directing it. The university has claimed to be the owner of it, and no one has drawn its rightful title in question. Can it now, while enjoying, without hostile claim from any source, the full control of the property, as its absolute owner, set up, as a reason why it should be allowed to take other property, that perhaps hereafter some one may make a claim that the prop-

erty does not belong to the university, but that it is a trust fund originating in the act of Congress? If the State or the United States were to commence some proceeding, based on the counsel's argument, to reclaim possession of the property, there is nothing in the present attitude of the university which would necessarily estop or in any way conclude it from denying that any such trust exists, or that any case had been made for taking the possession of the property out of its hands. So far as appears, it seems that this assumed indebtedness is entirely gratuitous on its part, and that there is no creditor who makes the claim, no one who questions its title. It is going a good ways, under such circumstances, to lay much weight on a liability which, up to this proceeding, was never admitted by the university, and is not now asserted by any one else. It would seem as if property which was thus in the possession of the corporation, unclaimed by any one else, was held by it within the meaning of its charter, and that the question in regard to the character of its holding was merely an abstract one with which courts would not deal, at least so far as this proceeding is concerned.

"In all these matters it must be borne in mind the parties have all been acting in the most entire and perfect good faith. This was no scheme to avoid or evade the provisions of the act of Congress. The price of sixty cents an acre which the State got for the land was all it was worth at that time. Its future value depended upon many contingencies. The State had the right to sell the scrip for such price as it might agree on on with a purchaser. This it did. The university wanted money to pay its expenses. It could not very well wait for twenty or even five years for the purpose of seeing how the value of this scrip would appreciate, if at all. The legislature was equally in earnest in its desire for the prosperity of the institution; so were the state officers, and, above and beyond all, so was Mr. Cornell, its generous founder, and already the donor of such a large amount of money. Taking all the circumstances into consideration, the plan carried out was hit upon, and the amount of the Cornell endowment fund and the property arising therefrom must be regarded as a gift of the donor and

founder, and not as a violation of either the act of Congress, or of the act of our own legislature."

The Court of Appeals then states (p. 131) the position of the university with reference to the value of its property as follows: Funds from individuals, (including the value of the university buildings, farm, grounds, etc., at $69,683.33,) as fixed by the surrogate, $598,588.65; Western lands, $1,648,178.56; Western land contracts, $439,334.22; total, $2,686,101.43. It states that the Supreme Court advanced the $69,683.33 to "$385,000," being an advance of "$315,316.67," and that, adding this $315,316.67 to the $2,686,101.43 makes a total of $3,001,418.10, without counting as property the College Land Scrip Fund in the hands of the State.

The statement that the Supreme Court advanced the $69,683.33 to $385,000 would appear by the record to be a clerical error, for, although Judge Merwin, in his opinion in the Supreme Court, states that the appellants there were entitled to a finding that the property represented by the item of $69,683.33 was, at the date of the death of Mrs. Fiske, of the value "at least" of $385,000, the judgment of the Supreme Court expressly adjudges that the item of $69,683.33 is fixed by it at $400,000, and that it finds that the value of the property of the university held and owned by it at the death of Mrs. Fiske was $3,015,414.71. But, in either case, the amount exceeded $3,000,000.

We concur with the Court of Appeals in the conclusion that the sixty cents per acre was the purchase price of the land scrip; that, under the agreement of August 4, 1866, the profits to be made by Mr. Cornell, although to be paid into the treasury of the State, were not any portion of the purchase price of the scrip, but were to be paid in, and were in fact paid in, as his profits, and were received by the State, as the sixth section of the agreement states, as, "a separate and distinct fund, which shall be the property of the Cornell University, to be known as the 'Cornell Endowment Fund,'" and that the income of the money was to be paid to the university for its general purposes, and the principal was to constitute the "Cornell Endowment Fund."

The Court of Appeals states that it cannot see that in all this there was nothing but an agency created in behalf of the State, and that Mr. Cornell was such agent, and that the whole profits were really nothing but the proceeds of the land scrip sold by the State. In this connection, a reference may not be inappropriate to the clear and incisive statement of Governor Seymour, in his minority report before referred to. After stating that his associates were of opinion that the contract was an actual sale to Mr. Cornell, but that all profits made from the land were part of the purchase-money, and so subject to the restrictions of the act of Congress, Governor Seymour says that he is forced to the conclusion that the construction which involves merging the two funds into one is inconsistent with the pledges of the State to Congress. He adds: "When New York accepted the grant of the general government, it did so with the full knowledge of this clause in the act of Congress, viz.: 'That the grant of land and of land scrip hereby authorized shall be made on the following conditions, to which, as well as to the provisions hereinbefore contained, the previous assent of the several States shall be signified by legislative acts.' One of these conditions is, 'that in no case shall any State to which land scrip may thus be issued be allowed to locate the same within the limits of any other State.' This State only had the right to sell its scrip. If it has no right to locate land openly and directly, can it do the same thing under cover and indirectly? If the State can claim all the proceeds of the lands entered by its scrip in the State of Wisconsin, after deducting the costs of taxes and expenses and the price of its scrip, does it not claim and get everything it would if the land had been taken up in the name of the State? Is there any stronger or clearer way of saying that a man is entitled to all there is of value in any property, than to say he has a right to all the money it will bring after paying taxes and expenses? Does any citizen of our country hold a more ample interest in land, by virtue of deeds or patents, than is held by him who has a right to all that it will bring by sales or leases, after paying taxes and expenses? All of our citizens who have lands in Western States, or elsewhere, in fact own

them upon these terms.   Is the case in any way changed by using the term *profit* in place of the word *proceeds*, to express the amount the State can claim by their construction of the contract?   Any construction of the contract with Mr. Cornell, which makes the State the substantial owner of these lands and converts the transactions into any agency, is not merely a technical and immaterial violation of its pledges.   It conflicts with the act of Congress and infringes in a serious way upon the rights of Wisconsin and other States where the lands held by Mr. Cornell are situated.   The careful way with which the law of Congress distinguishes between the proceeds of land and of land scrip was designed to protect such States.   But for the restraints of the act the old States could enter all their scrip at the land offices of the West.   Their wealth would enable them to pay taxes and keep the lands from market for an advance of price.   For this reason the restriction was put into the act.   Ownership by this State under cover, no matter what terms are used to hide its interests, or what objects or pretexts are displayed as an excuse for its action, is a violation of its pledges to Congress and of the rights and interests of other States.   As a rule, individuals are unable, for any length of time, to hold large tracts of land.   Nearly the whole amount of scrip given by Congress to the several States has been used by settlers to buy homes in the West, and has thus promoted their prosperity.   Congress contemplated this when it forbade one State to take up land within the bounds of another.   The agreement is a sale of the scrip to Mr. Cornell, and the profits made by him out of the lands taken up by him with the scrip, when given to the university, will be a gift for the general purposes of the institution, ' and not subject to the restrictions of the act of Congress.'   These profits will be the result of his skill and labor.   It is the intent of the act of 1862 that no State shall, under any pretence, in any manner, or in any degree, acquire title or right to lands in another State."

We are of opinion that, by the terms of the agreement, the State sold the scrip to Mr. Cornell, and that the legal title to the lands located by him under the scrip was vested in him when he took out patents upon such location.   The terms of

Dissenting ·Opinion: Brewer, Gray, JJ.

the agreement show that the profits which Mr. Cornell hoped to realize from the sale of the lands, beyond the second thirty cents per acre, were intended by both parties to the agreement to be a gift from Mr. Cornell personally to the university, and not from him as a mere agent of the State or of the United States; and that the State became the custodian of such profits, not under the act of Congress, but under the duty which it assumed to take care of the fund as a fund belonging to the university, as the property of the university, and to appropriate the income to the trustees of the institution for its general purposes. The State has provided, as required by the act of Congress, for the investment in the manner prescribed by that act, of the moneys derived from the sale of the land scrip. It was under no obligation to treat as falling within the provisions of the act of Congress any other moneys than those derived from the sale of such scrip, or any moneys derived from the sale of the lands which the purchaser of the scrip should locate and obtain patents for.

The State could not itself, or by an agent acting in its behalf, locate or obtain patents for any land which the scrip represented. Therefore, the claim of the university and of Mr. Boardman as executor, that the act of Congress was violated in the transaction between the State and Mr. Cornell, and that the moneys and property derived from the sale of the lands by Mr. Cornell formed, on the actual facts, no part of the $3,000,000 of property held by the university, is not warranted by law.

The judgment of the Supreme Court of the State of New York, entered December 12, 1888, establishing as its judgment the judgment of the Court of Appeals of New York, rendered November 27, 1888, affirming the judgment of the Supreme Court herein, entered December 14, 1887, is

*Affirmed.*

MR. JUSTICE BREWER (with whom concurred MR. JUSTICE GRAY) dissenting:

MR. JUSTICE GRAY and myself dissent from the views expressed and the conclusions reached in the foregoing opinion.

By the act of Congress of July 2, 1862, making a grant, and the act of the legislature of the State of New York, of May 5, 1863, accepting the same, a trust was created in the State of New York in respect to this land scrip. This is evident from these sections: 12 Stat. c. 130, pp. 503–505.

" AN ACT donating the Public Lands to the several States and Territories which may provide. Colleges for the Benefit of Agriculture and the Mechanic Arts.

" *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That there be granted to the several States for the purposes hereinafter mentioned, an amount of public land, to be apportioned to each State a quantity equal to thirty thousand acres for each senator and representative in Congress to which the States are respectively entitled, by the apportionment under the census of eighteen hundred and sixty : *Provided,* That no mineral lands shall be selected or purchased under the provisions of this act.

" SEC. 2. *And be it further enacted,* That the land aforesaid, after being surveyed, shall be apportioned to the several States in sections or sub-divisions of sections, not less than one quarter of a section ; and whenever there are public lands in a State subject to a sale at private entry at one dollar and twenty-five cents per acre, the quantity to which said State shall be entitled shall be selected from such lands within the limits of such State, and the Secretary of the Interior is hereby directed to issue to each of the States in which there is not the quantity of public lands subject to sale at private entry at one dollar and twenty-five cents per acre, to which said State may be entitled under the provisions of this act, land scrip to the amount in acres for the deficiency of its distributive share; said scrip to be sold by said States and the proceeds thereof applied to the uses and purposes prescribed in this act, and for no other use or purpose whatsoever : *Provided,* That in no case shall any State to which land scrip may thus be issued be allowed to locate the same within the limits of any other State, or of any Territory of the United

States, but their assignees may thus locate said land scrip upon any of the unappropriated lands of the United States subject to sale at private entry at one dollar and twenty-five cents, or less, per acre : *And provided further*, That not more than one million acres shall be located by such assignees in any one of the States : *And provided further*, That no such location shall be made before one year from the passage of this act.

&ast;　　　　&ast;　　　　&ast;　　　　&ast;　　　　&ast;

"SEC. 4. *And be it further enacted*, That all moneys derived from the sale of the lands aforesaid by the States to which the lands are apportioned, and from the sales of land scrip hereinbefore provided for, shall be invested in stocks of the United States, or of the States, or some other safe stocks, yielding not less than five per centum upon the par value of said stocks ; and that the moneys so invested shall constitute a perpetual fund, the capital of which shall remain forever undiminished, (except so far as may be provided in section fifth of this act,) and the interest of which shall be inviolably appropriated by each State which may take and claim the benefit of this act, to the endowment, support and maintenance of at least one college where the leading object shall be, without excluding other scientific and classical studies, and including military tactics, to teach such branches of learning as are related to agriculture and the mechanic arts, in such manner as the legislatures of the States may respectively prescribe, in order to promote the liberal and practical education of the industrial classes in the several pursuits and professions in life.

"SEC. 5. *And be it further enacted*, That the grant of land and land scrip hereby authorized shall be made on the following conditions, to which, as well as to the provisions hereinbefore contained, the previous assent of the several States shall be signified by legislative acts :

"First. If any portion of the fund invested, as provided by the foregoing section, or any portion of the interest thereon, shall, by any action or contingency, be diminished or lost, it shall be replaced by the State to which it belongs, so that the capital of the fund shall remain forever undiminished ; and the annual interest shall be regularly applied without diminu-

tion to the purposes mentioned in the fourth section of this act, except that a sum, not exceeding ten per centum upon the amount received by any State under the provisions of this act, may be expended for the purchase of lands for sites or experimental farms whenever authorized by the respective legislatures of said States.

&ast; &ast; &ast; &ast; &ast;

"Seventh. No State shall be entitled to the benefits of this act unless it shall express its acceptance thereof by its legislature within two years from the date of its approval by the President."

Under this statute, the action of the State designating one beneficiary was not final; and it could withdraw, thereafter, the income from one institution and bestow it upon another, even as it did, in fact, in this case, as shown by the record. Suppose, hereafter, Cornell University should be so conducted that its "leading object" should not be "to teach such branches of learning as are related to agriculture and the mechanic arts," as required by the act of Congress, it would be the right and the duty of the State to take the fund and apply it to that purpose by other means and instruments.

The sacredness of the duties cast upon a trustee, recognized from time immemorial, obtains; and the subsequent transaction by which the land scrip was disposed of cannot be interpreted as if it were a disposition by an absolute owner of his property. A trustee may not speculate in respect to trust property for his own benefit, or for the benefit of a friend, or in favor of any institution. The fact of a trust compels that all received as the proceeds of trust property, directly or indirectly, must be adjudged forever within the obligations of that trust.

The scrip became the property of the State in trust. The act of Congress determines the fact, the nature and extent of the trust. It grants land; or in the absence of public lands within the State, scrip to the corresponding amount. It provides, in section two, that where scrip is taken by a State, it may be sold by it, "and the proceeds thereof applied to the uses and purposes prescribed in this act, and for no other use

or purpose whatsoever." · Section three, while referring to the land which may be taken under the act, indicates fully the scope and intent of the trust, by enacting "that all the expenses of management, superintendence and taxes from date of selection of said lands, previous to their sales, and all expenses incurred in the management and disbursement of the moneys which may be received therefrom, shall be paid by the States to which they may belong, out of the treasury of said States, so that the entire proceeds of the sale of said lands shall be applied without any diminution whatever to the purposes hereinafter mentioned." Section four provides "that all moneys derived from the sale of lands, and from the sales of land scrip, shall be invested, etc.; and that the moneys so invested shall constitute a perpetual fund, the capital of which shall remain forever undiminished, and the interest of which shall be inviolably appropriated, etc., specifying the purposes of the appropriation." Obviously the scope of this is, that all moneys derived from this property, whether land or scrip, whether obtained directly or indirectly, are consecrated to the purposes designated, and must be held by the State in trust forever. Among the limitations provided is that expressed in the second clause in the fifth section, that "no portion of said fund, nor the interest thereon, shall be applied, directly or indirectly, under any pretence whatever, to the purchase, erection, preservation, or repair of any building or buildings." Nothing can be clearer from this statute than that a State, accepting its provisions, constituted itself a trustee, with the obligation that it should devote to the purposes of the act all the proceeds, of the land or land scrip which it might obtain, directly or indirectly.

The State of New York, having no public lands within its limits, received scrip; but the scrip was subjected to the same trust that land would have been subjected to, and was subjected to, when taken by any State. All expense in respect to the location and management of the lands, or the investment of the funds, was to be borne by the State, in order that the net proceeds of this grant, no matter how obtained, should be appropriated to the purposes expressed. Hence, the State

of New York, accepting the trust, was powerless to repudiate its obligations, or to provide for an appropriation for any other purposes, or under any other conditions, of the moneys which might be received, directly or indirectly, from the disposition of this trust property. Prior to November 24, 1865, scrip to the aggregate amount of 176,000 acres was sold at prices ranging from fifty to eighty-five cents — the average being sixty-five, nearly.

The first selection of the beneficiary of this trust was the People's College of Havana; but that selection was not satisfactory; and on April 27, 1865, Cornell University was established by act of the legislature of New York, and it was designated as the beneficiary; the act providing, as a condition of this selection, that Cornell University should be endowed to the extent of five hundred thousand dollars by Ezra Cornell. The provision in § 4 in its charter, that " the corporation hereby created may hold real and personal property to an amount not exceeding three millions of dollars in the aggregate," evidently means that the property of the corporation shall not exceed three millions, after deducting the amount of all its debts and obligations, and does not include property which the State might retake at any time, and *a fortiori* property which the State, under a duty imposed upon it by law, owned upon a trust which it could not divest itself of. Here, a reference to Mr. Cornell, and his connection with this transaction, is appropriate. A man acquiring wealth by his own exertions, the dream of his later years was a university, bearing his name, and so munificently endowed as to become, like Yale and Harvard, a centre of learning; and his purchase of the scrip, and his transaction with the State, must be interpreted in the line of this thought. It was the glory of a great university which he hoped to realize — one which would link his name with its glory. The means were subordinate — the glory and strength of Cornell University was the purpose. Unquestionably inspired by his thought and wish, on April 10, 1866, the legislature passed an act for the future disposal of the scrip, and authorized the Comptroller to fix its price. That price was

Dissenting Opinion: Brewer, Gray, JJ.

not to be less than thirty cents per acre.  The act also provided that he might contract for the sale thereof to the trustees of Cornell University; and that, if they did not purchase, the Commissioners of the Land Office might contract for the sale to any person or persons; but added, expressly, that "said trustees or such person or persons shall at the time make an agreement and give security for the performance thereof to the satisfaction of the Comptroller, to the effect that the whole net avails and profits from the sale of scrip or the location and use by the said trustees, person or persons of the said lands or of the lands located under said scrip, shall from time to time, as such net avails or profits are received, be paid over and devoted to the purposes of such institution or institutions as have been or shall be created by the act, chapter five hundred and eighty-five of the laws of eighteen hundred and sixty-five, of the State of New York, in accordance with the provisions of the act of Congress hereinbefore mentioned.  And the said trustees, person or persons to whom the said lands or scrip shall be sold, shall report to the Comptroller, annually, under such oath and in such form as the Comptroller shall direct, the amount of land or scrip sold, the prices at which the same have been sold, and the amount of money received therefor, and the amount of expenses incurred in the location and sale thereof."

This act has a twofold aspect: It is the legislation of a sovereign State, prescribing the duties and powers of one of its officials; and it is also a declaration of the duties cast by a trustee upon its agent in respect to trust property.  In either aspect, its voice is potential in respect to that which was under the authority thereafter done by official or agent.  It must be borne in mind that the State had no land — nothing but scrip.  This fact was known, and must be recognized in any interpretation of the powers granted.  What were they? First, to sell for cash, at a price not less than that to be fixed by the Comptroller.  Second, and this was obviously in view of propositions or suggestions made by Mr. Cornell as to what he was willing to do, that if no sale for cash was made, the scrip might be disposed of to any one who would give to this

fund the full benefit of any profits made by the location of the scrip upon public lands. Can it be doubted, under such a statute, that, if no absolute sale for cash was made, and the alternative proposition was finally accepted by the official and agent of the State and trustee, the net profits of such location and sale were to become and be a part of the trust funds? If language means anything, it means this. No stipulation by official or agent could nullify or thwart the express limitations of this power. An illustration or two will make this clear: Suppose under this authority the Land Commissioners had contracted with Mr. Cornell to take the scrip and locate it upon public lands, and out of the proceeds pay thirty cents an acre to the fund, and give the balance to the commissioners for their private gain, or to the State for the public purpose of a state house, or other matter of general interest, would any court or any person uphold for a moment the validity of such a contract so far as respects the latter provisions; and would not the universal voice declare that, notwithstanding it, the entire proceeds of the location of scrip and sale of lands belonged to the fund of which the State was the trustee? That is this case. The Comptroller fixed the price at fifty cents an acre, about fifteen cents an acre less than had heretofore been realized. Not only that, but while it is in evidence that the amount of scrip authorized by the act of Congress created a temporary depression in price, so that although no land was purchasable from Congress at less than one dollar and a quarter per acre, the price of scrip was temporarily reduced to less than half that figure; yet, as appears from the report of a commission, appointed in 1874 by the State of New York to inquire into this college land grant, the cash market value of the scrip was always at least fifty cents an acre and the sales by other States of scrip, amounting in all to 5,699,600 acres, ranged from fifty to ninety cents, only 120,000 acres having been sold below fifty cents. It is thus obvious that the depression in price was only temporary. The prior experience of the State of New York, the whole experience of other States, tends to show that fifty cents was the minimum value of this scrip.

Dissenting Opinion: Brewer, Gray, JJ.

. No sale was made, no contract of sale entered into at the price fixed by the Comptroller. The contract entered into was by virtue of the alternative authority given.

That contract was upon this proposition, from Mr. Cornell: "Appreciating, however, as I do most fully, your motives for desiring to give the utmost possible security and permanency to the funds which are, in a great degree, to constitute the endowment of the Cornell University, I shall most cheerfully accept your views so far as to consent to place the entire profits to be derived from the sale of the lands to be located with the college land scrip in the treasury of the State, if the State will receive the money as a separate fund from that which may be derived from the sale of scrip and will keep it permanently invested, and appropriate the proceeds from the income thereof annually to the Cornell University, subject to the direction of the trustees thereof, for the general purposes of said institution, and not to hold it subject to the restrictions which the act of Congress places upon the fund derivable from the sale of the college land scrip, or as a donation from the government of the United States, but as a donation from Ezra Cornell to the Cornell University. Acting upon the above basis, I propose to purchase said land scrip as fast as I can advantageously locate the same, paying therefor at the rate of thirty cents per acre in good seven per cent bonds and securities, and obligating myself to pay the profits as specified in chapter 481, of the laws of 1868, into the treasury of the State, as follows: Thirty cents per acre of said profits to be added to the College Land Scrip Fund, and the balance of said profits to be placed in a separate fund, to be known as the Cornell University Fund and to be preserved and invested for the benefit of said institution, and the income derived therefrom to be paid over annually to the trustees of said university for the general purposes of said institution."

. . It is unnecessary to notice other portions of the correspondence, or to review the contract, for all of significance is expressed in this proposition. It is not an absolute sale of the scrip for so much money. The obligation assumed by Mr. Cornell, to the State was thirty cents an acre, and the net prof-

its of the location of the scrip on public lands, and sale of the lands. In briefer words, thirty cents an acre and net profits was his offer. True, he proposed that only part of the profits, to wit, thirty cents an acre, should pass to the fund : but what authority had the commissioners for making such a limitation in the contract? Suppose, after the making of the contract, the commissioners had declined to transfer the scrip to him, could he have compelled the specific performance, by mandamus, of that contract? Would not a clear and satisfactory answer have been that the commissioners had no authority to partition the profits? The limit of their authority was a contract by which the agent and locator should pay to the State the whole net profits of the location. As Mr. Cornell could not have compelled, by mandamus, the performance by the commissioners of the contract, so, on the other hand, having received the scrip and located it, and disposed of the land, and paid the money into the State, that unauthorized stipulation becomes surplusage. It cannot relieve the State of New York from its liability as trustee. It is not potent to turn a portion of the proceeds of this scrip into other channels, or to other uses. The fact that all the proceeds were going to the selected beneficiary, doubtless led the commissioners to indifference as to the stipulations of the contract; but such indifference did not enlarge their powers nor make valid the stipulation in excess thereof. It seems strange that a trustee can avail itself of a disregard by its agent of his instructions so as to relieve itself of responsibility for about four-fifths of the proceeds of the trust property ; yet such is the result of the conclusions reached by this court.

We are sustained in this view by a report of a majority of the commission, appointed in 1874 by the legislature of the State of New York, to inquire into this fund ; for they say : " The question was raised in the Comptroller's report of 1869, and earlier, whether this agreement of 4th August, 1866, was a sale of the scrip to Mr. Cornell ; whether it was not, ' in substance, an agency with a transfer of title for the purpose of facilitating the object in view.' We are of the opinion that the agreement was an actual sale to Mr. Cornell ; but that all his profits, made from these lands, are part of the purchase-

Dissenting Opinion: Brewer, Gray, JJ.

money, and so subject to the restrictions of the act of Congress. Everything that forms a part of the consideration for the sale of the trust property by the State belongs to the trust fund created by Congress." And again: "We are asked, finally, to recommend 'what legislation is necessary to properly secure said funds in compliance with the act of Congress.' None seems to be necessary in reference to the fund to be derived from what are called the ultimate net profits from the location and sale of the lands by Mr. Cornell, under the agreement of August, 1866. By his contract with the State he is to pay these profits into its treasury, and he has twenty years in which to complete the sale of the lands. This fund is, in our opinion, a part of the proceeds of the scrip within the purview of the act of Congress, and cannot be legally distinguished from the other fund. Mr. Cornell seems to have taken this view before entering into the contract; for, in a public communication, dated October 26, 1869, referring to a letter from himself to Comptroller Hillhouse in June, 1866, he says: 'I volunteered to create a fund three or four times as large as that which the State could produce, for the same object that Congress intended, and at my own risk and expenses, without charging a single dime to anybody for my services.' He could not impose on the state treasury a new and distinct trust as to any part of the consideration he was to pay. Unless these profits are part of the purchase-money, the State gave to him for the college bearing his name a monopoly of the scrip on long credit for a price much less than its cash value. The second thirty cents per acre, provided for in the agreement, being dependent solely on contingent profits, which might not be realized, if at all, for twenty years, and then without interest, was not, at the date of the agreement, equivalent to more than from seven to ten cents. These profits, being part of the purchase-money, the State is bound to receive them, when, from time to time, realized, and invest them in the manner prescribed by the act of Congress, and to appropriate the income to the educational purposes in the act defined."

It is true, a minority of that commission dissented; but the

reasoning of the minority makes the contract of no validity, except as to the sale of the scrip for thirty cents an acre, and leaves only that amount as the fund for which the State is responsible. The reasoning is that the State was not authorized under the act to itself locate scrip on lands in another State; and if the profits of the location were to belong to the State, it would follow that the State was the beneficial owner of the lands thus located, and therefore there was a direct evasion of the act of Congress. Concede the force of that reasoning, and who can take advantage of it? Can the State which has received the proceeds of such location say that it had no authority to receive them; and can it, after receiving them, repudiate its liability as trustee for that which it has received as the proceeds of the trust property?

It scarcely need be said that no subsequent legislation on the part of the State of New York, and no agreement between it and Cornell University as to the possession of these funds, can have the effect to relieve the State from its liability as trustee, or place the title to those funds elsewhere than in the State.