April 16,
  1925.

## OPINION OF THE JUSTICES.

The requirements of a federal statute making a grant to a state for the benefit of its agricultural college that the fund be invested in the stocks of the United States or of the states are fully met by a statute of the state recognizing the fund as an obligation of the state and providing for the payment of interest to the college at a reasonable rate.

The Teachers' Institute Fund is a creation of the state out of its own funds, and as to it the state has no obligations, in any legal sense.

Contracts made by a state are obligations, though generally unenforceable at law. As to these, non-liability rests upon immunity from suit. As to non-contractual liability, however, the rule of sovereignty relieves a state not only from suit but also from obligation.

When executors under a will enter into a contract with the state as to the manner of administering a trust fund bequeathed to the state for the benefit of its agricultural college, upon the basis of a statute passed by the legislature, the statute is the measure of the state's obligation.

A contract having been entered into under statutory authorization by which the state received certain securities from the executors upon its agreement to account for their appraised value with interest at a fixed rate for a fixed period of accumulation, after which it was to hold the original fund and its accumulations as a trust and pay the income thereon to the college, the securities became the state's property and it was not under obligation to account for their income in excess of the rate of interest fixed by the agreement; and after the termination of the period of accumulation its one obligation was to pay interest on the fund at a reasonable rate, and to guarantee the integrity of the principal. It is for the state to determine what rate is reasonable.

On March 31, 1925, the House of Representatives adopted the following resolution:

Whereas, The legislature is considering a reorganization of the methods of bookkeeping and accounting now in use in the office of the State Treasurer in relation to trust funds held by the State, and

Whereas, In this consideration questions have arisen as to the legal right and duty of the State in certain particulars, and

Whereas, These questions are of importance and material upon the determination of the proper course to be pursued; therefore be it

Resolved, That the Speaker of the House be and hereby is directed to obtain from the Justices of the Supreme Court at the earliest possible date their opinions upon the following questions:

I. Under the provisions of the Act of Congress approved July 2, 1862 (12 Statutes at Large, Chapter 130), Chapter 2732 of the Session Laws of 1863 and Chapter 4216 of the Session Laws of 1866 the State holds a fund of $80,000 known as the "Agricultural College Fund." Prior to September 1, 1884, this fund was invested in bonds of the State of New Hampshire, which matured on that date. Since then the fund has not been separately invested but has appeared on the books of the State Treasurer as a liability, and the state has appropriated, and semi-annually paid to the beneficiary the sum of $2,400 as interest on said fund.

Do the above acts and proceedings of the State constitute a compliance with the obligations of the State with respect to the grant of the fund?

II. Under the provisions of Chapter 73 of the Laws of 1883, the State holds a fund known as the "Teachers' Institute Fund." The fund has not been separately invested, but has appeared on the books of the State Treasurer as a liability. The State annually credited interest to the fund at the rate of 6 per cent. until May 31, 1896. Since then, in accordance with Chapter 57 of the Laws of 1895, the State has credited interest at the rate of 4 per cent. Varying sums have been paid from the treasury each year for the expenses of teachers' institutes and charged to this fund, whose principal amount on the books of the Treasurer is now $59,723.37.

Do the above acts and proceedings of the State constitute a compliance with the obligations of the State under the act of 1883 with respect to this fund?

III. The State holds a fund known as the "Benjamin Thompson Trust Fund." The following exhibits are transmitted relative to this fund:

1. A copy of the report of the State Treasurer for 1892, in which

appear copies of the will of Benjamin Thompson and of the contract made by the State with the executors of the will. Reference is also made to Chapter 12 of the Laws of 1891, Chapter 125 of the Laws of 1903, and Chapter 131 of the Laws of 1909.

2. A schedule showing for each year from 1910 to 1924, inclusive, the amount of the fund, the amount of the original securities, the amount of other investments and the balances.

3. A schedule of the cost or appraisal of all securities of the fund which have been sold or which have matured since the fund became accumulated in 1910; also of the receipts from their sale or maturity.

4. A statement of the income received from the securities since 1910, of the average annual rate thereof, of the actual amounts paid by the State above the income received from securities, and of the average rate paid by the State on balances not invested in securities.

5. A schedule showing the list of securities now held, together with the original appraised value of such securities and the approximate present market value thereof.

A. Have the acts and proceedings of the State of New Hampshire from 1910 to the present time been in compliance with the obligations of the State, with respect to (1) the principal of the fund; (2) the income of the fund?

B. What is the obligation of the State, for the future, with respect to —

1. Accounting for capital gains or capital losses which may result from the sale or maturity of securities received from the executors of Benjamin Thompson in September, 1891, and now held?

2. The payment of income to the Trustees of the University of New Hampshire?

The following answer was returned:

*To the House of Representatives:*

Your inquiries relate to the obligations of the state in relation to certain funds. It is our understanding that you mean legal obligations as distinguished from those which rest upon other grounds. As to questions of expediency, our opinions could not be required. *Opinion of the Justices,* 72 N. H. 601, 603.

In taking up these questions, the inquiry at once arose whether they did not concern vested rights of the New Hampshire College of Agriculture and the Mechanic Arts; and if they did, whether we

ought to express an opinion. In view of the fact that the college is merely a state educational institution, created, managed and in the main supported by the state, it appeared doubtful whether it could be said to have rights, in a legal sense, as against the state. Further consideration of this question was rendered unnecessary by the action of the college. It appeared by counsel and disclaimed any right to complain of the treatment which the state has accorded to it in the past, or now accords to it, in relation to the subjects of inquiry. In this situation, it seemed clear to us that your questions should be answered.

I. The first question relates to the federal grant of 1862. 12 U. S. St. at Large, *c.* 130. Under this act certain funds came to the state for the use of the college. The act provides that the state may invest the fund in "stocks" of the United States, or of the states, etc. *Ib., s.* 4. The legislature provided that the fund might be invested in the bonds of this state. Laws 1866, *c.* 4216, *s.* 7. The same thing was done in New York (*Cornell University* v. *Fiske,* 136 U. S. 152, 184) and in other states. When the bonds matured in 1884, the item was entered upon the books of the state treasurer as a state debt, and the state has paid to the college six per cent thereon annually since that time. This procedure was in accordance with the legislative direction. Laws 1883, *c.* 83. The act further declares that "the same shall be held . . . as a trust fund for the benefit of said college until otherwise ordered by the legislature." *Ib., s.* 2.

The limitation upon the investment by the act of congress is not expressed with any technical accuracy. The term, "stocks" of a state, merely refers to state obligations. It does not prescribe the form that such obligations shall take. It would seem that any form which fairly established the obligation would be sufficient. The form here adopted is the acknowledgment of a sum due, which as between individuals would carry an obligation to pay interest. It has been so treated here, both in the provision of the statute and the practice under it, and the college has had the benefit of a much higher rate of interest than ordinarily would have been obtained by an investment in state bonds.

The procedure is attacked upon the ground that a trustee cannot invest trust funds in his own obligations. We do not think that there was ever any intent that this rule should apply to the states in the administration of federal funds for the benefit of land grant colleges. The bonds of any state were made legal investments for

every other state, and if there had been a purpose to exclude the home state from the same right, it would have been expressed. In this aspect of the inquiry, there is no difference between the bond of the state and any other form of its obligation. The practice for the state to invest the fund in its own obligations, or (what is the same thing so far as the security of the fund is concerned) to treat it as an outstanding obligation of the state, was adopted when the fund was first received and has been followed ever since. It is assumed that this action was reported to congress (12 U. S. St. at Large, c. 130, s. 8), and that no objection to this mode of procedure has ever been made by the donor. This of itself is convincing proof that the procedure adopted does no violence to the donor's purpose. The practice of nearly sixty years, acquiesced in by all who are interested in the subject, is not lightly to be disregarded. It is not to be set aside and declared invalid for technical reasons, nor because the policy of the law inhibits an individual trustee from acting in the manner adopted.

It is our opinion that the acts and proceedings of the state constitute a compliance with the obligations of the state, with respect to the grant of this fund.

II. The Teachers' Institute Fund is a creation of the state out of its own funds. No other party has any interest in the matter either as donor, trustee, or beneficiary. It follows that as to this subject the state has no obligations, in any legal sense.

III. Your third inquiry relates to dealings with the property left to the state by Benjamin Thompson, and designed to benefit the New Hampshire College of Agriculture and the Mechanic Arts.

The state being sovereign, and not generally subject to suit, except by its consent, its liabilities are limited accordingly. *Kaemmerling* v. *State, ante,* 405. But while it is not subject to legal proceedings, the validity of contracts it may make is a question of law as to which the legislature is entitled to advice, in order that legislative action may be determined upon the ground that if the state has promised, it will not fail to perform. *Opinion of the Justices,* 72 N. H. 601.

Contracts made by a state are obligations, although generally unenforceable at law. *Ohio &c. Company* v. *Debolt,* 16 How. 416. As to these, non-liability rests upon immunity from suit, and not upon absence of obligation. But the rule of obligation does not extend beyond this. As to non-contractual liability, the rule of

sovereignty relieves a state not only from suit but also from obligation. As to such matters non-liability does not "rest upon the narrow ground that there are no means by which such obligations can be enforced, but on the larger ground that no obligation arises therefrom." *Murdock &c. Co.* v. *Massachusetts,* 152 Mass. 28. This distinction is of importance in the consideration of the situation relating to the Thompson fund.

It follows from the foregoing propositions that any obligation of the state as to this trust, concerning which we can advise you, must have its origin in a contract made by the state. This excludes any consideration of the liability which an individual might incur if he took trust property in violation of the terms of the trust. The state is under no such liability. The argument advanced, that the state has violated the provisions of the will even if it has complied with the terms of its contract, is of no moment here. Whatever obligation there may have been to carry out these provisions merely because trust property came into the possession of the state is purely a moral one, as to which we have no right to advise.

The inquiry here starts, not with the will, but with the contract. The contract depends for its validity upon the statute authorizing the governor and council to act. Laws 1891, *c.* 12. So far as the contract was authorized by the statute, it is the state's obligation. If it is in any respect in excess of that authority, it puts no obligation upon the state as to such unauthorized stipulations.

The provisions of the statute are not as harmonious as could be desired. Reference is made to raising and appropriating money for the required guaranteed income. From this it is argued that the intent was to keep the fund and its accumulations invested in securities rather than to treat them as outstanding charges against the state. But this view is negatived by other explicit provisions detailing the precise manner in which the matter is to be dealt with.

The treasurer is directed to open an account, charging the state with the appraised value of the estate received. To this account is to be added each year the stipulated interest of four per cent. The account so made up is to represent the fund at the end of twenty years. The estate received is to be dealt with as the property of the state. It may be sold, and if sold the proceeds are to be applied to the payment of the state debt. There is no provision for reinvestment. These provisions leave no room for reasonable doubt as to what the state authorized in the way of a contract.

In ascertaining the meaning of the statute, the terms of the will, in view of which the statute was enacted, are to be considered, as other surrounding circumstances are. But they are mere aids to interpretation. They do not control or vary the plain terms of the statute.

The provisions of the will do not cast any doubt upon the intent the legislature had. While the will speaks frequently of the trust and the trust fund, it makes no stipulation as to the management of the property, and says nothing as to reinvestment. The objects the testator had in mind were to be secured by the pledge of the state that the funds should accumulate and thereafter perpetually furnish an income to the college. So insistent was he upon this feature, that he provided for the proffer of the gift, so conditioned, to three states in succession. He stipulates for a guaranteed fixed rate of interest during the accumulation period. He speaks of the time when "my said estate shall be turned over to and become the property of the state." In the provision for anticipating the period of accumulation, he stipulates that the fund be made up to an amount equal to what it would become if accumulated for twenty years. This manifestly excludes any idea that there might be an excess income to be credited to the fund. In the first codicil he adds a provision that he not only authorizes but also directs his executors "to make and enter into such stipulations . . . as will secure the objects which are intended to be secured by my said will." This plainly made the executors his representatives in determining how doubtful or incomplete provisions of the will were to be interpreted or supplemented, and gave them authority to provide for administrative details.

If, in view of all that the will contains, it could be construed as calling for anything more than the pledge of the word of the state that the state would hold itself accountable for the amounts indicated, still the construction evidently put upon it by the legislature is not an unreasonable one. The will does not plainly run counter to the statute, and the terms of the statute are not modified by a consideration of the provisions of the will.

The possible inconsistencies in the statute were manifestly induced by like infirmities in the will. But, unlike the will, the statute puts beyond reasonable doubt the matter of how the trust is to be administered. In the exercise of a wise precaution, the legislature explained in advance to the representatives of the testator precisely how the state would deal with the property, if delivered to it.

With full knowledge and understanding of the construction the state put upon the will, and of the declared purpose to administer the trust accordingly, the executors assented thereto by accepting the contract which provided that the statute setting out the method of administration should be kept in force and that all of its provisions should be fully observed. In this way the state took possession of the estate, and began to administer it under the statute.

In this practical construction of the doubtful terms of the will the beneficiary also joined. The state took the property late in 1891, and charged itself with the stipulated interest from the date of Benjamin Thompson's death, which was January 30, 1890. The state treasurer's report of 1892 shows in detail how the matter was being dealt with. It includes the statement that the principal at the testator's death, as augmented by the two years' compound interest at four per cent, was $393,511.30. It also states that for the two years the income of the property had exceeded the interest stipulated for by over $8,000.00, that the whole income had been paid into the state treasury, and that the excess was not accounted for as any part of the trust, or credited to it.

In April, 1892, the college trustees authorized and instructed their president to examine the accounts, "and if he finds such account satisfactorily stated, to certify his approval thereof in behalf of the New Hampshire College of Agriculture and the Mechanic Arts." Acting under this authority, the president, on May 12, 1892, certified that he had critically examined the accounts and approved the same.

It thus appears that the state's interpretation of the will, as declared in the statute, was agreed to at the time by all who had any interest in the estate. Unless the executors understood that the conditions laid down by the state complied with the terms of the will, it was their duty to make tender of the bequest to the state of Massachusetts. The beneficiary made special examination of the state's conduct, and certified approval thereof.

Some question was made as to the administration of the trust in 1899, and the attorney-general then advised the governor and council that the procedure was in compliance with the statute, that the securities belonged to the state, in exchange for which it had given its guaranty. Thereafter the same method of dealing with the subject was continued until the close of the twenty-year period.

The question then arose as to what should be done in the future.

Beyond the guaranty to maintain the principal of the fund, and to devote the income to the use of the college, there is no provision either in the will or in the statute as to action to be taken after that time. The fund stood upon the books of the state as a state liability, as the statute had provided. In this situation the state adopted the method already in use for twenty-six years as to the federal fund for the benefit of the same institution. It provided for the payment to the college of four per cent annually upon the whole sum, payable quarterly.

It is to be borne in mind that the state had never entered into any contract to pay to the college any fixed rate of income, or to keep the fund invested. It had contracted to do precisely what it did up to this time, and then to administer the trust, represented by the account provided for, in accordance with the will. *Ib., s.* 5. The will is silent as to this subject, save for the stipulation that the income should be paid to the college and the integrity of the principal guaranteed by the state. The testator regarded four per cent as a proper rate of income. The statute and the contract provide for that rate during the accumulation period. In view of this it would seem to have been a fair assumption for the legislature of 1909 to make that a payment of four per cent would discharge all the obligation the state had undertaken. It did so provide. Laws 1909, *c.* 131.

The contention that if a higher rate could have been obtained by the investment of the fund in other securities, it was the legal duty of the state to take that course, ignores the fact that under the statute, which is the sole foundation for any legal obligation of the state, the scheme of administration excluded any such action in terms. Not only is there no provision for any reinvestment of the fund, there is the positive direction that all money coming into the treasury from the realization of securities be applied to another purpose.

Argument is made that because the state has retained certain of the original investments, which have largely increased in value and now yield large returns upon the original inventory valuation of the same, therefore the state is under a duty to account for such income, or for the increase in value. This ignores the basic fact that the estate was taken over under an agreement that the specific property passed to the state, and that the state was to be charged on the basis of the inventory plus a stipulated rate of interest. What the property did or did not thereafter produce had no effect upon the

amount payable under the statute. The object of the will, the statute and the contract was to eliminate chance, and to make the college sure of a uniform income. The state took the chance of gain or loss.

Attention has been called to argumentation in the dissenting opinion of Judge *Doe* in *Orr* v. *Quimby*, 54 N. H. 611 *et seq.*, to the effect that the state cannot substitute its credit for the payment necessarily to be made to one whose property is taken *in invitum* for a public use. If the proposition there contended for were conceded to be sound, it would have no application to the present situation. There is here no taking of property, or repudiation of obligation. The state made a proposition of terms upon which it would receive the property. Those terms were accepted, and the compact thus entered into is the only basis for any obligation of the state.

The argument that a trustee cannot substitute his own promise to pay in the place of a legal investment is beside the mark for the same reason. If the state could be deemed subject to the usual rules when it accepted a trust in general terms, it plainly is not so limited when it has stipulated for a different rule of conduct as a condition of the obligation.

Stated in brief the situation is this: The state laid down terms upon which it would take the estate. Those terms involved the transfer of the specific property to the state, as its own, and substituting therefor the state's acknowledgment of indebtedness, together with a guaranty to perpetually maintain the amount, and pay the income to the college. Rate of income was agreed upon at four per cent for a twenty-year period, and that rate has since been maintained by the state. The agreement having contemplated putting the fund into this form, and providing no data by which income was to be computed after the twenty years, the obligation of the state was to pay a reasonable rate. Apparently the rate fixed and paid is reasonable, but whether it is so or not is a question of fact, and not of law.

Whatever criticism there may be of the method by which this matter has been handled from the beginning must rest upon questions of policy, as to which we have no concern. The state is under no legal duty to go through the process of raising money and investing it in securities to constitute this fund, because it took the fund under a contract which provided otherwise, and has been fully performed.

In so far as any question of law is involved, it is our opinion that

the state has fully discharged all its obligations in respect to the Benjamin Thompson fund.

The foregoing probably fully answers your inquiries; but as you have asked specifically as to future duty to account for capital gains or losses arising from dealings with the securities received from the executors, and now held by the state, we restate our view of the law as applied to that situation. The securities are no longer a part of the trust. They passed to the state by virtue of the contract before referred to. As stated in the before-mentioned opinion of Attorney General Eastman, "The college has the state's guaranty and the state as compensation for the guaranty has the Thompson fund." If the trust created by the will could be held to have been violated by that agreement, the state would not be under any legal obligation to account as a trustee *ex maleficio*, or as the holder of a constructive trust. As before pointed out, this non-liability rests upon the absence of obligation on the part of the state, and not merely upon the rule that the state cannot be sued.

The question, what would be a compliance with the terms of the will, has not been considered, except in so far as the will is an aid to the interpretation of the statute.

You inquire still further as to future duty with respect to "the payment of income to the Trustees of the University of New Hampshire." This is evidently an inadvertence. The University has no interest in the matter, and no claim upon the income. The trust is for the college, which continues to be a separate corporate entity. Laws 1923, c. 106, s. 3. Assuming that you desire advice concerning the duty as to future payments to the college, we repeat what has been said heretofore. There is a promise to pay income, but no rate is fixed. It follows that the rate is to be a reasonable one.

The obligation to pay such a rate arises from the terms of the contract. Although that obligation cannot be enforced because of the sovereign character of the promisor, yet its existence creates a legal duty, which the state could not refuse to perform, except by repudiation.

As before stated, the question what is a reasonable rate is one of fact. But how that question is to be determined is matter of law. The nonsuable character of the state would prevent the resort to a legal tribunal, if complaint were made as to the rate offered. It is for the state to determine what rate will be reasonable. It might, if it chose to do so, waive its immunity and submit the question to some tribunal, if controversy over the subject (now nonexistent)

should hereafter arise.   In the absence of further legislative action, the rate will remain as fixed by the act of 1909.   Laws 1909, c. 131.

ROBERT J. PEASLEE,
WILLIAM A. PLUMMER,
LESLIE P. SNOW,
JOHN E. ALLEN,
THOMAS L. MARBLE.

April 16, 1925.

*Dwight Hall*, for the college.

*Frank N. Parsons* (orally), for the present procedure.

*John R. McLane* (orally) and *Fred C. Demond* (orally), opposed.